**OLD FARM HOMEOWNERS ASSOCIATION, Respondent,**

v.

**William A. LINDGREN, Patricia K. Lindgren and Phelps County, Missouri, Respondents,**

and

**Petroleum Plus, Inc., Appellant.**

No. 22938.

Missouri Court of Appeals, Southern District, Division One.

March 24, 2000.

Thomas J. Casey and Matthew J. Devoti, Casey & Meyerkord, P.C., St. Louis, for appellant.

W.H. Thomas, Jr., Thomas, Birdsong & Becker, P.C., Rolla, for respondent Old Farm Homeowners Association.

No other appearances.

CROW, Presiding Judge.

Old Farm Homeowners Association[1] ("OFHA"), identifying itself as a Missouri

1. Two documents in the record show this    entity's name is "OLD FARM HOME OWN-

"general not-for-profit corporation" sued four defendants: William A. Lindgren, Patricia K. Lindgren, Phelps County, Missouri, and Petroleum Plus, Inc. ("PPI"). OFHA pled, and PPI admitted, that PPI is "a general business corporation" incorporated in Missouri.

The relief sought by OFHA included a declaratory judgment proclaiming Spring House Lane—a road in a Phelps County subdivision—is "a private road managed and controlled by [OFHA]."

Following a bench trial,[2] the court entered judgment granting that prayer and other relief sought by OFHA.

PPI appeals. Its lone assignment of error maintains the trial court "improperly considered extrinsic evidence" to vary language in the subdivision plat which "dedicate[ed] to public use forever all streets ... shown upon this plat." Adjudicating the claim of error requires an account of the pertinent evidence, much of which consisted of recorded documents.

William A. Lindgren ("Bill Lindgren")[3] and his wife, Patricia K. Lindgren, bought the south half of the northeast quarter of the southeast quarter in a section, township and range in Phelps County "about ... [19]82." This opinion henceforth refers to that parcel as "the 20–acre tract."

Sometime after buying the 20–acre tract, the Lindgrens purchased the northwest quarter of the southeast quarter in the same section, township and range. This opinion henceforth refers to that acquisition as "the 40–acre tract." The

south half of the east side of the 40–acre tract abuts the west side of the 20–acre tract.[4]

On November 7, 1983, the Lindgrens filed a document denominated "Declaration of Covenants, Conditions and Restrictions of Old Farm Subdivision, Number One" in the office of the Recorder of Phelps County. This opinion henceforth refers to that document as "the Original Declaration."

The Original Declaration stated the Lindgrens intended to create "a residential community with permanent roads and other common facilities" on the 20–acre tract.[5] The Original Declaration recited, *inter alia*, that the Lindgrens desired to provide for "maintenance of common facilities, including roads (until such time that it is beneficial to dedicate these roads to Phelps County for their maintenance)." The Original Declaration said the Lindgrens had "incorporated under the laws of ... Missouri as a not-for-profit corporation OLD FARM HOME OWNERS ASSOCIATION[.]"[6] That entity was referred to in the Original Declaration as the "Association."

Article IV, § 2 of the Original Declaration provided that the Lindgrens would convey the common properties "to the Association, free and clear of all liens and encumbrances, not later than June 30, 1987." Article IV, § 3(d) of the Original Declaration authorized the Association to dedicate or transfer all or any part of the common properties to any public agency, authority, or utility subject to such condi-

ERS ASSOCIATION." However, the second amended petition (on which the case was tried) and the judgment identify the entity as "Old Farm Homeowners Association." Rule 81.03, Missouri Rules of Civil Procedure (2000), provides: "[T]he title of the action shall not be changed in consequence of the appeal." Accordingly, this opinion employs the name in the second amended petition and judgment.

2. No one appeared for Phelps County at trial. All other parties were represented by counsel.

3. Throughout the transcript, Mr. Lindgren is referred to as "Bill." For brevity and clarity, this opinion employs that name.

4. Bill Lindgren testified he and his wife bought the 40–acre tract "a year or two" after the 20–acre tract. A document in the record indicates the Lindgrens acquired the 40–acre tract by deed dated September 14, 1983, and recorded October 7, 1983.

5. The Original Declaration did not mention the 40–acre tract.

6. Footnote 1, *supra*.

tions as may be agreed to by the members of the Association. However, that could be done only by an instrument signed by members entitled to cast two-thirds of the votes of each class of membership.

Besides those provisions, the Original Declaration covered a multitude of subjects including architectural control of structures in the subdivision, sewage and wastewater treatment, prohibited activities and vehicles, fences and driveways, trash containers and collection, signs, exterior construction materials, and animals.

On November 15, 1983 (eight days after filing the Original Declaration), the Lindgrens filed a plat of "Old Farm Subdivision, Number One" in the office of the Recorder of Phelps County. This opinion henceforth refers to that document as "the Original Plat."

The Original Plat showed the 20–acre tract had been subdivided into seven large lots.[7] A road identified as Phelps County Road 44 ("Road 44") was shown on the Original Plat. Road 44 ran north to south along the east edge of the subdivision. Another road, identified as Spring House Lane, was also shown on the Original Plat. Spring House Lane began at the west edge of Road 44 near the southeast corner of the subdivision and proceeded northwest some 600 feet, then due west to the west edge of the subdivision.

Four of the lots in the subdivision lay north of Spring House Lane; three lay south.

On November 23, 1986 (three years after the Lindgrens filed the Original Plat), James J. Bass and Ann R. Bass contracted with the Lindgrens to buy a lot in the subdivision. That was the Lindgrens' first sale in the subdivision.

On December 17, 1986, before the sale to the Basses was closed, the Lindgrens filed a plat of "Old Farm ca. 1859" in the office of the Recorder of Phelps County.

This opinion henceforth refers to that document as "the Second Plat."

The Second Plat recited that the Lindgrens desired "to re-subdivide the property formerly known as Old Farm Subdivision Number One, and to add the additional land shown on this plat to said re-subdivision." The Second Plat, as this court comprehends it, added an 85–foot strip to the entire west side of the subdivision, the 85–foot strip being part of the 40–acre tract. The Second Plat reduced the size of some of the lots in the Original Plat and increased the number of lots in the subdivision from seven to nine.

The Second Plat, like the Original Plat, showed two roads: Road 44 and Spring House Lane. Their locations on the Second Plat appear to coincide with the Original Plat except Spring House Lane was extended west to the new west edge of the subdivision. There, Spring House Lane ended as a cul-de-sac.

On the second page of the Second Plat was a segment denominated "DEDICATION," signed by the Lindgrens. It provided, *inter alia*, that the Lindgrens "do hereby dedicate to public use forever all streets ... shown upon this plat[.]" Following that statement was a proviso that the Original Declaration "shall apply with equal force to all of the land described on this plat."

Another segment of the Second Plat was designated "COUNTY COMMISSION APPROVAL." It recited that the Second Plat "was duly submitted, reviewed and approved by the Phelps County Commission" on December 11, 1986.

The sale to the Basses was closed December 23, 1986. This court gleans from the record that the Basses bought lot 6 as shown on the Second Plat. It was one of the four on the Second Plat that lay south

---

7. The smallest lot was 1.4 acres. Four others were between two and three acres. The two

largest were three acres.

of Spring House Lane; the other five lay north.

This court understands from Bill Lindgren's testimony that the original surface of Spring House Lane was gravel. Bill explained that the firm that constructed the road recommended the gravel surface be used as long as possible "in order for all settlement to occur." Eventually, the easternmost half was paved with asphalt, then "later in 1990, the second half was paved."

In 1993, Marty Brown and Kimberly Brown bought lot 8 from the Lindgrens. By then, the Lindgrens had sold other lots in the subdivision to other buyers.

Lot 8, the Browns' property, is the westernmost lot on the south side of Spring House Lane. Consequently, the west side of lot 8 is the west edge of the subdivision.

On September 12, 1995, the Browns bought a 4.09–acre tract from the Lindgrens. That tract abutted the west edge of lot 8 and lay in the southeast corner of the 40–acre tract. After that sale, the Lindgrens still owned about 35 acres of the 40–acre tract.[8] This opinion henceforth refers to those 35 acres as "the remaining 35 acres."

Dennis LaBantschnig is evidently chief executive officer and sole shareholder of PPI.[9] Sometime after the Browns bought the 4.09–acre tract, LaBantschnig became interested in the remaining 35 acres. On a date unrevealed by the record, LaBantschnig, acting for PPI, arranged for PPI to buy the remaining 35 acres, together with two lots in the subdivision, from the Lindgrens.

At that time, John Beger and his wife, Cynthia, owned a lot in the subdivision and resided in a house thereon.

The sale to PPI was scheduled to close May 23, 1997, at the office of John Z. Williams, a lawyer.

LaBantschnig testified that a few days before the closing, John Beger appeared at his (LaBantschnig's) office and informed him that OFHA "had a problem with Bill Lindgren." LaBantschnig quoted Beger as saying, "[I]t's a possibility [Spring House Lane is] a private road."

LaBantschnig avowed that after the encounter with Beger, he (LaBantschnig) telephoned Williams and asked about the "status" of Spring House Lane. According to LaBantschnig, Williams responded, "It's my belief that this is a public road, but let me check into it to be certain, and I'll get back with you."

LaBantschnig recounted that Williams contacted him later and "said unequivocally it's a public road."

The significance of whether Spring House Lane is public or private is revealed in the next six paragraphs.

The remaining 35 acres are landlocked on the north, west and south. As reported earlier, Spring House Lane ends as a cul-de-sac at the west edge of the subdivision (the east edge of the remaining 35 acres), just north of the northeast corner of the 4.09–acre tract owned by the Browns.

LaBantschnig testified he planned to build himself a home somewhere on the west 20 acres of the remaining 35 acres and intended to use those 20 acres as a "private area." He envisioned subdividing the remaining 15 acres into residential lots and extending Spring House Lane west to provide access to those lots and his home. At his home, Spring House Lane would end as a cul-de-sac.

---

**8.** As recounted earlier, an 85–foot strip from the 40–acre tract was added to the west side of the subdivision in the Second Plat. That strip amounted to a little more than one acre.

**9.** PPI's brief asserts (without reference to the record) that LaBantschnig "is the sole officer,

director, and shareholder of [PPI]." LaBantschnig's testimony included this:

"Q.... Your company, Petroleum Plus—And by the way, you are Petroleum Plus?
A. That's correct."

LaBantschnig told the trial court the homes he had in mind would be compatible with those already in the subdivision.[10] LaBantschnig testified: "I'm going to live there. And I surely don't want to desecrate the neighborhood."

The only other access to the remaining 35 acres is Meadowview Lane. It runs east to west through a neighborhood immediately north of the subdivision. At its east end, Meadowview Lane enters Road 44. Proceeding west, Meadowview Lane deadends at the east edge of the remaining 35 acres.

LaBantschnig testified it would not be "economically feasible" to use any of the remaining 35 acres for "luxury homes" if the only access was Meadowview Lane. According to LaBantschnig, the homes along Meadowview Lane are significantly smaller than those on Spring House Lane and "not maintained as well." Furthermore, said LaBantschnig, Spring House Lane is wider and better maintained than Meadowview Lane.[11]

While it was important to LaBantschnig that Spring House Lane be public, it was likewise important to residents of the subdivision that Spring House Lane be private. Four residents testified they bought their respective properties believing Spring House Lane was private, thereby affording them more privacy and better protection of their property values than if Spring House Lane were public.

OFHA commenced this suit May 22, 1997 (the day before the scheduled closing of the sale by the Lindgrens to PPI). However, the trial court's docket sheet indicates only the Lindgrens and Phelps County were named defendants.[12]

The sale by the Lindgrens to PPI closed May 23, 1997, as scheduled. At the closing, Bill Lindgren and lawyer Williams assured LaBantschnig that Spring House Lane was a public road.

The deed by which the Lindgrens conveyed the remaining 35 acres to PPI contained a provision that those acres were subject to thirteen paragraphs of "restrictive covenants." The covenants appeared in the deed, addressing subjects including use of the property for only single family residential dwellings, minimum lot size, minimum dwelling size, prohibited activities, wastewater treatment, and signs. One covenant, paragraph 13, is set forth below, as it was the subject of one of the rulings in the judgment appealed from here.[13]

The case was tried on OFHA's second amended petition; it comprised four counts. Count I prayed for a declaratory judgment that Spring House Lane is "a private road managed and controlled" by OFHA. Count II prayed for a declaratory judgment that paragraph 13 in the deed from the Lindgrens to PPI is invalid.[14]

---

10. There was evidence that the subdivision is "a subdivision of luxury homes."

11. There was evidence that the County Commission of Phelps County maintains Meadowview Lane as "part of the County road system." LaBantschnig described the part of Meadowview Lane nearest the remaining 35 acres as "basically gravel and ... dirt." According to LaBantschnig, Spring House Lane is paved "right up to the edge" of the remaining 35 acres.

12. The docket sheet shows PPI was added as a defendant about a month later.

13. Paragraph 13 read:
"Each owner of a single family residential dwelling shall be subject to the covenant for maintenance assessments to the extent that such assessments are made for the maintenance of Spring House Road [sic] which runs through Old Farm ca. 1859, a subdivision of Phelps County, Missouri, and for that purpose shall have the same voting privileges with respect to such assessments as are set forth in Article V in the [Original] Declaration ... recorded November 7, 1983 .... Each owner of a single family dwelling in the [remaining 35 acres] shall be treated the same as if such person owned a lot in Old Farm ca. 1859 for purpose of such road maintenance assessments."

14. Paragraph 13 is set forth in footnote 13, *supra.*

Count III prayed for an order commanding the Lindgrens to convey Spring House Lane to OFHA "free and clear of all liens and encumbrances." Count IV prayed for an injunction barring PPI "from using and authorizing others to use Spring House Lane for access to the [remaining 35 acres]."

Bill Lindgren testified he never intended to "dedicate" Spring House Lane to Phelps County. He avowed he told realtors and prospective buyers that Spring House Lane was a private road. However, explained Bill, an issue arose at an OFHA meeting in 1995 about maintenance of Spring House Lane, whereupon he told the homeowners he wanted to "deed the road" to OFHA.

Bill recounted he asked lawyer Williams "to create a deed for the transfer." Williams advised Bill to "get a legal description of the road."

Bill asked Richard L. Elgin (a licensed professional engineer and land surveyor who had prepared the Second Plat) for a legal description. According to Bill, Elgin stated one was unnecessary because the "wording on the dedication on the [Second Plat]" dedicated Spring House Lane as a public road.

Elgin, testifying by deposition, said lawyer Williams prepared the "dedication" language on the Second Plat.

Williams, testifying by deposition, conceded he drafted the "dedication" language. Williams added: "[I]n reading the dedication on [the Second Plat], based on what I put in it, I intended to dedicate that road to the public."

In a memorandum prepared after trial, the trial court noted the Second Plat stated the Original Declaration "shall apply with equal force to all of the land described on this plat." The memorandum continued:

"Clearly, it was the intent of the [Lindgrens] in preparing and executing the [Second Plat] to cause the real property that is described in said subdivision

plat to be subject to aforesaid covenants and restrictions. Said restrictions provide for the [Lindgrens] to maintain ownership and control of the street in said subdivision until the development of the subdivision reaches a certain stage at which time the [Lindgrens] are to convey ownership of the street to [OFHA]. Thus, the provisions of the covenants and restrictions for the subdivision pertaining to the street restrict its ownership and control as a private street.

The language contained in said [Second Plat] is ambiguous. The Court must therefore look to the evidence to find the intent of the [Lindgrens].

The Court finds from the evidence that it was never the intent of the [Lindgrens] in preparing any of the plats ... or the restrictive covenants ... to cause Spring House Lane to become a public road. That intention has never changed. What has changed, apparently, is the opinion of the [Lindgrens] as to the legal status of the road. That opinion has changed as a result of opinions expressed by the [Lindgrens'] surveyor and counsel. The latter opinions were apparently based on the inclusion of the language in the [Second Plat] that purports to dedicate the road to public use."

The trial court entered judgment declaring Spring House Lane a private road and granting all of the other relief sought by OFHA.

■ PPI's brief presents one point relied on; it reads:

"The trial court erred in holding Spring House Lane to be a private road because the trial court improperly considered extrinsic evidence to vary, add to, or contradict the terms of unambiguous language in that the trial court considered extrinsic evidence of the intention of defendants Lindgren concerning the public/private nature of Spring House Lane though the language dedicating 'to public use forever all streets

and easements shown upon [the Second Plat]' contained under the heading 'DEDICATION' on page two of the [Second] Plat executed by defendants Lindgren in December 1986 indicated an express and unequivocal intent by defendants Lindgren to dedicate Spring House Lane to the public use."

PPI's hypothesis of error, as this court divines it from the argument beneath the point, is that the following declaration in the segment denominated "DEDICA-TION" on the second page of the Second Plat established Spring House Lane as a public road:

> "[The Lindgrens] do hereby dedicate to public use forever all streets ... shown upon this plat[.]"

PPI avers chapter 445, RSMo 1986,[15] provided a "comprehensive plan" for platting subdivisions and dedicating land therein for streets. PPI maintains the above-quoted language irrevocably dedicated Spring House Lane to public use. Citing *Ginter v. City of Webster Groves,* 349 S.W.2d 895 (Mo.1961), PPI proclaims a dedication meeting the requirements of chapter 445 is valid "without any formal acceptance by the appropriate governmental body." [16]

For the reasons that follow, this court holds *Ginter* governs this appeal.

The plaintiffs in *Ginter* were trustees of a subdivision in the City of Webster Groves. *Id.* at 896. The city was the sole defendant. *Id.* The issue in *Ginter* was whether two streets in the subdivision had been dedicated to public use and were therefore public streets. *Id.*

The subdivision plat in *Ginter* showed twenty residential building lots and the streets. *Id.* at 897. The plat recited, *inter*

*alia:* "[The streets] ... shown ... on the ... plat, are hereby dedicated to public use forever." *Id.* However, the plat also stated that the lots shall be sold "subject to the conditions, restrictions, covenants and agreements contained in a declaration of restrictions filed for record on even date with this instrument." *Id.*

The plat in *Ginter* was approved by the city December 2, 1954; however, the city reserved the right to withhold acceptance of the streets until they were approved by the city engineer. *Id.*

The plat and an "Indenture" of restrictions were filed for record simultaneously on March 7, 1955. *Id.* The Indenture was executed by the owner of the subdivision and the subdivision's board of trustees. *Id.* The plaintiffs in *Ginter* argued that the plat and the Indenture were inconsistent and contradictory in that the plat purported to dedicate the streets to public use, but the Indenture indicated the streets were to be held in trust by the trustees for the sole use and benefit of the lot owners. *Id.*

One provision in the Indenture declared the parties intended that the streets "shall be reserved for the exclusive use and benefit of the owners of lots in [the subdivision.]" *Id.* Another provision in the Indenture stated the streets "are to be held in trust by the Trustees for the exclusive use and benefit of all the lot owners in [the subdivision]." *Id.*

Three years after the plat and Indenture in *Ginter* were recorded, the subdivision's trustees filed a document purporting to "revoke, cancel and annul the alleged or purported dedication" of the streets. *Id.* at 898. The document declared the trustees would "hold said streets in trust for the exclusive use and benefit of the lot owners" of the subdivision. *Id.*

15. Chapter 445, RSMo 1986, was in force when the Lindgrens filed the Second Plat. Chapter 445 was carried forward unchanged in RSMo 1994.

16. As reported earlier, a segment of the Second Plat designated "COUNTY COMMIS-SION APPROVAL" recites that the County

Commission of Phelps County approved the plat December 11, 1986 (six days before the plat was recorded). However, there was uncontradicted evidence that Spring House Lane is maintained by OFHA, not Phelps County.

Two months later, the city council in *Ginter* adopted an ordinance formally accepting the "statutorily dedicated streets." *Id.*

The trial court in *Ginter* entered a declaratory judgment that the streets had "been dedicated to public use." *Id.* at 896.

On appeal by the plaintiffs in *Ginter*, the Supreme Court of Missouri framed the initial issue thus:

> "The plaintiffs' first contention is that the streets in question were never dedicated to public use because the plat and the owner's declarations thereon constituted an offer only which was withdrawn or revoked before it was accepted by the City. The defendant counters with the contention that the owner of the subdivision had the power to dedicate the streets and that the dedication was legally sufficient both under the statutes and under the rules of common law."

*Id.* at 899.

The Supreme Court pointed out that Missouri statutes (chapter 445, RSMo 1949) provide a comprehensive plan for platting subdivisions and dedicating land "for streets and other public uses." *Id.* The opinion continued:

> "When the dedication of streets within a city complies with the statutory provisions, the dedication is valid and irrevocable without acceptance by the city."

*Id.* at [3].

The Supreme Court then considered whether the dedication in *Ginter* satisfied the statutory requirements despite the alleged conflict between the dedicatory language on the plat and the provisions in the Indenture. On that issue, the Court said:

> "We find that the clear and specific expression [in the plat] of intention to dedicate the streets to public use prevails over the general provisions of the Indenture. While these provisions [in the Indenture] apparently have no present usefulness, they could become activated if the subdivision acquires parks, [17] or if present streets are vacated and become private or if new ones of a private character are created. We cannot interpret the Indenture as an attempt to recapture or avoid the intent to dedicate the streets as shown by the plat. It follows that the Indenture did not vest the trustees with any authority to revoke the offer of dedication."

*Id.* at 901[9].

As explained below, the facts in the instant case supporting OFHA's theory that Spring House Lane is a private road are weaker than the facts supporting the plaintiffs' claim that the streets in *Ginter* were private. *A fortiori*, *Ginter* supports PPI's position that Spring House Lane is public.[18]

Two provisions in the Indenture in *Ginter* declared the streets were "for the exclusive use and benefit" of lot owners in the subdivision. *Id.* at 897. No such provision appears in the Original Declaration in the instant case. The Original Declaration states only that the Lindgrens desire to provide for "maintenance of common facilities, including roads (until such time that it is beneficial to dedicate these roads to Phelps County for their maintenance)." For that purpose—and others—the Lindgrens incorporated OFHA and provided in the Original Declaration that when OFHA was able to maintain Spring House Lane, they (Lindgrens) would convey it to OFHA "free and clear of all liens and encum-

---

17. The opinion in *Ginter* pointed out that no parks were shown on the plat. *Id.* at 901. OFHA concedes no "common facilities" except Spring House Lane are shown on the Second Plat.

18. This court is mindful that *Ginter* involved a subdivision in a municipality. This court nonetheless finds *Ginter* persuasive in that the issue in *Ginter* arose—as does the issue here—from a conflict between a plat that unequivocally dedicated streets "to public use forever" and an Indenture that recited the streets were for the exclusive use of lot owners in the subdivision.

brances." That was to occur "not later than June 30, 1987."

Apparently, the trial court reasoned that because the Lindgrens originally owned the land on which they constructed Spring House Lane, and because the Lindgrens had to maintain Spring House Lane until OFHA became financially able to do so, Spring House Lane was a private road. OFHA cites no authority supporting that hypothesis.

When a developer subdivides unimproved land, it is patently necessary that access be provided to each platted lot. Where, as here, no road crosses the land, the developer must build one. That does not mean such a road is private.

It is noteworthy here that before the first sale in the subdivision was closed—the 1986 sale to the Basses—the Lindgrens (who by then had built Spring House Lane) filed the Second Plat stating they "do hereby dedicate to public use forever all streets ... shown upon this plat[.]" Nothing on the Second Plat or in the Original Declaration (which was to "apply with equal force to all of the land described on [the Second Plat]") stated Spring House Lane was for the exclusive use and benefit of lot owners in the subdivision.

OFHA's brief does not attempt to distinguish *Ginter,* and the seven cases cited by OFHA in an effort to support the trial court's judgment are not on point. In five of those cases there was no conflict between a plat and subdivision restrictions. In another case, the dispute concerned a right-of-way agreement, not a plat or subdivision restrictions.

■ The remaining case cited by OFHA stands for the proposition that a doubt about rights created under a recorded plat are resolved against the party responsible for preparing it. According to OFHA, that principle applies to PPI because PPI claims through the Lindgrens "whose agents prepared the plat."

OFHA's argument is meritless, as OFHA also claims through the Lindgrens. OFHA's theory that Spring House Lane is private is based on the Original Declaration, prepared at the instance of the Lindgrens and signed and recorded by them.

This court also finds it significant that the Original Declaration specifically referred to a time in the future when it would be beneficial to dedicate the "roads" in the subdivision to Phelps County for *maintenance.* Anyone reading that provision could not reasonably expect the County Commission of Phelps County to spend public funds to maintain Spring House Lane as a private road.

For the reasons set forth above, this court holds the trial court erred as a matter of law in declaring Spring House Lane a private road. That portion of the judgment is reversed and this case is remanded to the trial court with a directive to enter judgment on Count I of OFHA's second amended petition declaring Spring House Lane a public road.

The portion of the judgment enjoining PPI and others from using Spring House Lane for access to the remaining 35 acres is also reversed. On remand, the trial court shall enter judgment denying all relief sought in Count IV of OFHA's second amended petition.

Because this court's rulings on Counts I and IV may affect the positions of the parties on Counts II and III, the parties, on remand, may desire to present further evidence or argument to the trial court regarding those counts. To enable the trial court to craft a different judgment on those counts if such be appropriate, this court also reverses the judgment on those counts.

The judgment is reversed in toto and this case is remanded to the trial court for further proceedings consistent with this opinion.

PARRISH, J., concurs.

SHRUM, J., concurs and files concurring opinion.

KENNETH W. SHRUM, Judge, concurring.

I concur. However, I question the scope of chapter 445, RSMo.1994. In my view, a compelling argument can be made that chapter 445 is not implicated for subdivisions outside of municipalities. However, we need not resolve that issue here. I agree with the principal opinion that *Ginter* is persuasive for the reasons expressed in note 18.