IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 16, 2007 Session

**JERRY BUNDY**

**v.**

**FIRST TENNESSEE BANK NATIONAL ASSOCIATION d/b/a
FIRST TENNESSEE EQUITY LENDING**

An Appeal from the Circuit Court for Shelby County
No. CT-007084-03    Kay S. Robilio, Judge

---

**No. W2006-02565-COA-R3-CV  - Filed December 13, 2007**

---

This is an age and sex discrimination case. The fifty-nine-year old male plaintiff worked for the defendant bank as a loan officer. In April 2003, he attempted to process a loan for a customer and did not disclose to the bank underwriting department documents he had received from the customer. When this was discovered, the plaintiff was placed under investigation. His employment was ultimately terminated for violating bank policy. The plaintiff filed this lawsuit, alleging age and sex discrimination. The bank filed a motion for summary judgment, arguing that the plaintiff could not establish a *prima facie* case of discrimination, or that the bank's legitimate non-discriminatory reason for terminating him was pretextual. The trial court granted summary judgment in favor of the bank. The plaintiff now appeals. We affirm, concluding that the plaintiff submitted insufficient evidence to establish the fourth element of his *prima facie* case, that he was either replaced by an employee outside the protected class, or that he was treated less favorably than a similarly situated employee outside the protected class.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Dan M. Norwood and David B. Stevenson, Memphis, Tennessee, for the appellant, Jerry Bundy.

Frederick J. Lewis and Whitney K. Fogerty, Memphis, Tennessee, for the appellee, First Tennessee Bank National Association d/b/a First Tennessee Equity Lending.

**OPINION**

In 1993, the Plaintiff/Appellant Jerry Bundy ("Bundy") began working for Defendant/Appellee First Tennessee Bank National Association d/b/a First Tennessee Equity Lending ("the Bank") as a loan officer. Early in 2002, he voluntarily quit to work elsewhere. In July 2002, the Bank rehired Bundy, again as a loan officer. At the time Bundy was rehired, he was approximately fifty-nine (59) years old.

As a loan officer, Bundy was the primary contact between the Bank and customers who sought loans at the Bank. He took the initial information from the customer, electronically recorded that information, gathered the required documentation from the customer, and forwarded that information to the Bank Underwriting Department for an initial or prequalification determination as to whether the customer qualified for the loan.

Generally, the Bank offers three types of loans to its customers: (1) a Stated Income loan, (2) a No Income Verification loan, and (3) a Full Documentation loan. The Stated Income loan is a "fast track" loan with minimal documentation. The borrower is required only to file a signed Tax Form 4506, which permits the government to pull a customer's tax returns for a period of sixty days, if need be, and a homeowners' insurance authorization form. It is approved based only on the borrower's stated income; the borrower need not file documentation to substantiate his claimed income. In contrast, the Full Disclosure loan requires documentation of income for approval. For a No Income Verification loan, the loan officer does not question the customer as to their income. The Full Disclosure and No Income Verification loans can take four to six weeks for approval, while Stated Income loans usually take only two to three weeks to process.

The Bank had written guidelines for the different types of loans, but they were subject to verbal changes. In early 2003, Bundy asked Bank managers Neil Kane ("Kane") and Curt Gwaltney ("Gwaltney") for a copy of the Bank's updated guidelines manual, but was told that they "hadn't gotten them yet." To protect themselves against guideline violations, some loan officers, including Bundy, had borrowers provide a signed written statement regarding income prior to final approval of their loan. The loan officers were told by their superiors that this practice was unnecessary, and in fact were told to stop requiring such a written statement.

On Saturday, April 19, 2003, Bundy was discussing a loan with a customer and suggested that the customer apply for a Stated Income loan. Bundy faxed the required application and authorization forms to the customer to fill out. The application and forms were to be returned by fax. On Monday, April 21, 2003, Bundy came to work and picked up the documents that had been faxed to him by the customer. In addition to the items Bundy had requested, the customer faxed some tax returns. The tax returns indicated that the customer had less income than he had claimed. Bundy was aware that, under the Bank's policies and guidelines, if the Bank received any income documentation from a customer seeking a Stated Income loan, he was rendered ineligible for the Stated Income loan program. Nevertheless, when Bundy received the customer's income tax returns, he did not convert the loan to a Full Disclosure loan and submit the tax returns with the application.

Instead, Bundy set aside the customer's tax return documents at his desk and continued to process the loan as a Stated Income loan.

Subsequently, the Bank's Underwriting Department discovered a discrepancy in the rental income reported by the customer and advised Bundy that the loan would need to be processed as a Full Disclosure loan. At that point, Bundy took the tax return documents he had received from the customer, which he had kept in his desk, and gave them to the Bank Underwriting Department for processing. Bank personnel in Underwriting noticed that the date on the faxed tax return documents was April 19, 2003, even though the loan application was dated April 21, 2003.

When Sherrie Canaday ("Canaday"), a vice president at the Bank in her late thirties, learned that Bundy had held back the customer's tax returns and continued to process the loan as a State Income loan, she referred the matter to the Bank's Quality Control Department. Thereafter, Clay Barnett ("Barnett"), a loss prevention officer with the Bank's Corporate Security Department, was told about Bundy's treatment of the loan, and he conducted an investigation of the incident. This was the second referral that Barnett had received on a loan processed by Bundy within a one-week period.

As part of his investigation, Barnett interviewed Bundy. In the interview, Bundy acknowledged that processing the loan as a Stated Income loan was a mistake and that he should have processed it as a Full Documentation loan.[1] After the interview, Bundy wrote a statement, dated May 8, 2003, in which he acknowledged his conduct and admitted that he had made a mistake, that his conduct was "wrong," and that he should have changed the loan from a Stated Income loan to a Full Documentation loan. He apologized for his error and asked that he be forgiven and permitted to keep his job.

After Barnett's investigation of Bundy's handling of the loan was complete, Barnett met with manager Gwaltney and Carroll McCormick ("McCormick"), a representative of Employee Services, to discuss the matter. On May 9, 2003, Bundy was terminated for violation of established Bank policy.

On December 13, 2003, Bundy filed this lawsuit against the Bank, alleging that the Bank had unlawfully terminated him based on age and sex discrimination in violation of the Tennessee Human Rights Act, Tennessee Code Annotated §§ 4-21-101, *et seq*. ("the Human Rights Act" or "the Act"). Bundy asserted that he and several other older male loan officers were singled out for investigation of their processing of loans by the Bank's two younger female vice presidents, and he alleged that this was done because they were male and over age forty. He claimed that female loan officers and/or younger loan officers had processed loans in a manner not in compliance with Bank policy and were not terminated, and that in the year following his termination he was replaced by individuals who were female and/or much younger. Bundy noted his excellent work record as a Bank loan officer, and asserted that firing him based on the one alleged incident of violating Bank

---

[1]David Schaff, a Bank employee located in Dallas, Texas, also participated in the interview by telephone.

policy was actually a pretext for terminating his employment based on his age and his sex. Bundy sought injunctive relief, damages of $1,000,000, and reasonable attorney's fees.

Discovery ensued. The parties took the depositions of Bundy and several other Bank employees involved in Bundy's termination. On July 31, 2006, the Bank filed a motion for summary judgment. The Bank argued that it was entitled to summary judgment because Bundy could not establish the required elements of a *prima facie* case for age or sex discrimination. Specifically, the Bank contended that Bundy could not show that he was qualified for the position, or that he was replaced by an employee who was substantially younger and/or female, or that he was treated less favorably than a similarly situated employee who was substantially younger and/or female. In the alternative, the Bank argued that it had shown a legitimate, nondiscriminatory reason for terminating Bundy's employment, namely his admitted violation of Bank policy, and that Bundy had no evidence that this reason was pretextual.

In response to the Bank's motion, Bundy submitted evidence showing his qualifications as a Bank loan officer and asserted that he was replaced by a younger female loan officer, Wilda Graham. Bundy also argued that another younger female loan officer, Kate Boyle, was similarly situated to him and was treated more favorably, showing that the Bank's stated reason for terminating his employment was pretextual. Thus, Bundy argued that sufficient evidence was submitted to create a genuine issue of material fact for trial on both the establishment of a *prima facie* case and the issue of pretext.

On October 23, 2006, the trial court entered an order finding that "no reasonable jury could find in favor of the Plaintiff based on the undisputed facts." The trial court held that Bundy was unable to establish a *prima facie* case of either age or sex discrimination and that, even if a *prima facie* could be established, the Bank had demonstrated "legitimate, non-discriminatory reasons for the employment decision at issue, as to which Plaintiff has no evidence to prove pretext." Therefore, the trial court granted summary judgment in favor of the Bank. From this order, Bundy now appeals.

On appeal, Bundy argues that the trial court erred in granting summary judgment to the Bank. He maintains that he submitted sufficient evidence to establish a *prima facie* case of age and sex discrimination by showing that he was qualified for the position of loan officer, that he was replaced by a substantially younger female, and that he was treated less favorably than an employee not in his protected class who was similarly situated to him. In addition, Bundy asserts that he submitted sufficient evidence to create a genuine issue of fact regarding whether the Banks's proffered reason for termination of his employment was pretextual.[2]

---

[2]In oral argument on appeal, Bundy appeared to contend that he was asserting a claim of "age plus sex" discrimination, rather than claims of age discrimination and/or sex discrimination. It is unclear how this would change our analysis, but we find no indication in the record that Bundy asserted such a claim in the trial court below. Issues cannot be raised for the first time on appeal. *See City of Cookeville ex rel. Cookeville Regional Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004).

We review the trial court's grant of summary judgment *de novo* with no presumption of correctness. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997). Summary judgment is not a substitute for trial of disputed factual issues. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44 (Tenn. Ct. App. 1993). It is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We view the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Warren*, 954 S.W.2d at 723. The moving party must demonstrate that no genuine issues of material fact exist for trial "by either affirmatively negating an essential element of the non-moving party's claim or by establishing an affirmative defense that defeats the non-moving party's claim." *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 601 (Tenn. Ct. App. 2007). Once the moving party establishes that there are no genuine issues of material fact, the non-moving party must demonstrate that a disputed issue of material fact exists either "(1) by pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) by rehabilitating evidence challenged by the moving party, (3) by producing additional evidence that creates a material factual dispute, or (4) by submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery." *Id.* at 602 (quoting *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001)).

Bundy asserts age and sex discrimination under the Tennessee Human Rights Act, which prohibits discrimination in employment on the basis of "race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-101(a) (2005).[3] One of the stated purposes of the Act is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972 . . . and the Age Discrimination in Employment Act of 1967, as amended ...." *Id.* Thus, because the Tennessee Human Rights Act and the federal statutes have a common purpose, we look to federal caselaw for guidance. *Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000). The same general analytical framework and allocation of the burden of proof is used for claims under both federal and state statutes, irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act. *Dennis v. White Way Cleaners, L.P.,* 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003).

Age and sex discrimination can be proven by direct or circumstantial evidence.[4] *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997); *Wilson v. Rubin*, 104 S.W.3d 39, 51 (Tenn. Ct. App. 2002). In this case, there is no direct evidence of discrimination on the basis of either sex or age, and Bundy must rely on circumstantial evidence to prove his claims. Where there is no direct evidence of discrimination, the plaintiff's claims must be analyzed under the framework

---

[3] To fall into the protected class on the basis of age, the plaintiff must be at least forty years old at the time of the discrimination. T.C.A. § 4-21-101(b) (2005).

[4] The analytical framework and burden of proof for age and sex discrimination claims bought under the Act is the same as that used for claims brought under federal law. *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003).

set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 580 (Tenn. Ct. App. 2000). This framework can be summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for [its actions.]" [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).] Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.*, at 804, 93 S.Ct. At 1825.

*Versa*, 45 S.W.3d at 580 (footnote omitted). This framework is explained in greater detail below.

A *prima facie* case of age discrimination under the Act may be established by showing that the plaintiff (1) was a member of the protected class, i.e. that he forty years old or older, (2) was qualified for the position, (3) was terminated, and (4) was replaced by a substantially younger person. *Sisk v. Commercial Furniture Group, Inc.*, 174 Fed. Appx. 283, 286 (6th Cir. 2006); *Dennis*, 119 S.W.3d at 693-94. The Court of Appeals for the Sixth Circuit has held that a plaintiff may also establish the fourth element of the *prima facie* case by "presenting evidence that he was treated less favorably than a similarly situated younger employee."[5] *Hagedorn v. Veritas Software Corp.*, 129 Fed. Appx. 1000, 1002 (6th Cir. 2005).

The elements of a *prima facie* case of sex discrimination under the Act are similar. To establish a claim for sex discrimination, the Plaintiff must show that he (1) was a member of the protected class;[6] (2) was qualified for the position, (3) was terminated, and (4) either that he was replaced by a person outside the class or "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see Wilson*, 104 S.W.3d at 52.

Assuming the plaintiff can establish a *prima facie* case of employment discrimination, the burden of *production* shifts to the defendant to articulate a legitimate, non-discriminatory business reason for terminating the plaintiff. If the defendant can do so, the burden shifts again to the plaintiff to present some evidence that the defendant's reasons were pretextual. *See McDonnell Douglas*, 411 U.S. at 802; *Dennis*, 119 S.W.3d at 694; *Versa*, 45 S.W.3d at, 580. "On a motion for summary judgment, the plaintiff need not totally refute the defendant's assertions as to its reasons for its

---

[5]The "similarly situated younger employee" may be within the protected class, *i.e.*, at least forty years old, so long as the compared employee is substantially younger than the plaintiff. *See Frame v. Davidson Transit Organization*, 194 S.W.3d 429, 439 (Tenn. Ct. App. 2005).

[6]Traditionally, the protected class in cases of sex discrimination are female. However, the Tennessee Human Rights Act prohibits discrimination in the workplace whether the discrimination disadvantages men or women. *Wilson*, 104 S.W.3d at 52.

actions, but must present some evidence, whether direct or circumstantial, that is sufficient to create a genuine issue of material fact as to the motivations of the defendant." ***Dennis***, 119 S.W.3d at 694. The burden of production is sharply distinguished from the burden of proof, which never shifts from the plaintiff: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." ***Texas Dep't of Comm. Affairs v. Burdine***, 450 U.S. 248, 253 (1981).

In this case, the trial court concluded that Bundy had not established a *prima facie* case of either age or sex discrimination. In its motion for summary judgment, the Bank argued that Bundy could not establish a *prima facie* case of age or sex discrimination because he could not establish two necessary elements: (1) that he was qualified for the position, or (2) that he was either replaced by an employee who was substantially younger and/or female, or that he was treated less favorably than a similarly situated person outside of his class, i.e. someone substantially younger and/or female. Bundy contends on appeal that he submitted sufficient evidence to create a genuine issue of material fact on both of these elements. We discuss each in turn.

First, Bundy argues that he submitted sufficient evidence to establish that he was qualified for the position of loan officer. Bundy points to his unblemished nine-year work record as a loan officer, which is not in dispute. In response, the Bank argues that a primary qualification for the position of loan officer is integrity, and that Bundy's undisputed breach of Bank policy shows that he lacks this quality. The Bank points out that Bundy agreed in his deposition that one of the primary qualifications for the position of loan officer is integrity. The Bank relies on Bundy's May 8, 2003 letter and portions of his deposition testimony as evidence that Bundy knew that he violated the Bank's policy by processing the loan in question as a Standard Income loan. This evidence shows, the Bank contends, that Bundy lacked integrity and was therefore unqualified for the position of loan officer.

In its argument, the Bank would have us ignore Bundy's nine-year tenure at the Bank which, except for the incident that cost him his job, demonstrates Bundy's ability to perform the essential functions of the job to the satisfaction of his superiors. Whether Bundy possesses the integrity necessary for the position is an issue for the trier of fact, considering all of the evidence. We decline to hold as a matter of law that Bundy was not qualified for the position. Therefore, the Bank was not entitled to summary judgment based on Bundy's failure to establish this element of his *prima facie* case.

We next consider the last element of Bundy's *prima facie* case, which can be established by showing either that Bundy was replaced by a person outside the protected class or that he was treated less favorably than a similarly-situated employee outside the protected class.

Bundy argues first that he was replaced by a female employee who was substantially younger, forty-eight-year-old Wilda Graham ("Graham"). The record shows that Graham was hired by the Bank in June 2000, and began working as a loan officer in June 2003, one month after Bundy's termination. Bundy notes that the Bank normally completes certain employment forms when an

employee is terminated, indicating who replaced the terminated employee.  In this case, however, no such forms were produced.  Thus, because Graham began working as a loan officer shortly after Bundy's employment was terminated, and the Bank could not show who replaced Bundy, he argues that a reasonable inference can be made that Graham replaced Bundy in his position as loan officer.

In response, the Bank notes that, after Bundy was terminated, his customers and pending loan issues were transferred to Tom Carry, a fifty-six-year-old male loan officer.  The Bank also cites Graham's affidavit, explaining how she came to be reassigned to the position of loan officer in June 2003.  In her affidavit, Graham stated that she had previously worked at the Bank as an underwriter.  In April 2003, on her own initiative, she applied for the position of loan officer.  Shortly thereafter, she took a medical leave of absence, which began on April 30, 2003 and ended on June 1, 2003.  Upon returning to work, Graham was given the loan officer position for which she had applied in April 2003.  While Bundy had worked the day shift and had reported to Neil Kane and Curt Gwaltney, Graham's affidavit stated that she worked the night shift from 1:00 p.m. to 10:00 p.m. and reported to Larry Thomas.  In light of this evidence, the Bank argues, there is not sufficient evidence to create a genuine issue of fact as to whether Bundy was replaced by Graham or any other person outside his protected class.

We are mindful that "a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."  **Hagedorn**, 129 Fed. Appx. at 1002, *quoting* **Barnes v. GenCorp., Inc.**, 896 F.2d 1457, 1465 (6th Cir. 1990)).  Here, the only evidence in the record indicating that Graham replaced Bundy is the Bank record showing that Graham's first loan was processed on June 21, 2003, one month after the termination of Bundy's employment.  Graham's affidavit, however, shows that she was given the position of loan officer pursuant to her April 2003 application for the job, and that she received it only after she returned from medical leave.  It is undisputed that Graham was assigned to a different shift than Bundy, and that she had a different supervisor.  The undisputed evidence also shows that Bundy's existing business was assigned to Tom Carry, a male employee not substantially younger than Bundy.  Given these facts, we must conclude that there is not sufficient evidence from which a trier of fact could reasonably infer that Bundy was replaced by Graham or any other person outside of the protected class.

In the alternative, Bundy argues that he can establish his *prima facie* case by showing that he was treated less favorably than a similarly situated, substantially younger female employee, Kate Boyle ("Boyle").  In determining whether another employee is similarly situated to the plaintiff, the comparable employee "must be similar in all of the relevant aspects" to the plaintiff.  **Id.** at 1003 (quoting **Johnson v. Kroger Co.**, 319 F.3d 858, 867 (6th Cir. 2003)).  The Sixth Circuit Court of Appeals has explained:

> . . . [T]o be deemed "similarly situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

-8-

*Mitchell*, 964 F.2d at 583. One "relevant aspect" to be considered is whether the plaintiff's conduct and the conduct of the person to whom he compares himself are of "comparable seriousness." *Id.* "It is the discrimination plaintiff's burden to establish that the other employee's acts were of 'comparable seriousness' to his or her own infraction." *Id.* at 583 n.5.

The only Bank employee Bundy alleges is similarly situated to him is Boyle, a female loan officer who was in her twenties at the time in question. The evidence shows that, in June 2003, Boyle attempted to process a No Income Verification loan for a retiree, although retirees are not eligible for that type of loan. To enable Boyle to process the loan application, Boyle was granted a variance, that is, special permission to process a loan despite an irregularity. It is unclear whether Boyle requested the variance, or whether it was simply given to her. The variance was granted by Sherrie Canaday, a female Bank Vice President in her thirties. Canaday testified in her deposition that the customer's high credit score made it acceptable to process the loan as a Stated Income loan, and that the variance was granted because of an error committed by underwriter Mary Harris. The record of authorization also indicates that the loan involved a "customer service issue." At the time of Boyle's transaction, the bank guideline from which she deviated was included in the Bank's written loan guidelines.[7]

As further indication of the Bank's alleged discriminatory intent, Bundy points to an incident involving Bank employee David Gravatt ("Gravatt"), a male loan officer in his fifties at the time in question. As with Boyle, Gravatt submitted an application for a No Income Verification loan on behalf of a retiree, who was not eligible for such a loan. For reasons not apparent in the record, Gravatt did not receive a variance for the loan; the Bank investigated him for fraud, but he was ultimately not disciplined or terminated. Bundy contends that all of this evidence shows that Boyle was similarly situated to Bundy, and that she was treated more favorably than either Bundy or Gravatt, both male employees in their fifties.

---

[7]Bundy submitted evidence suggesting that the guideline he violated in processing the State Income loan went into effect on May 27, 2003, just after his employment was terminated. Bundy appears to be arguing either that there was no such guideline in effect at the time he processed the State Income loan, or that he was unaware of it. The undisputed evidence in the record, however, establishes that there was in fact a verbal policy on Stated Income loans to the effect that a loan could not be processed as a Stated Income loan if income documentation had been submitted, and that Bundy was aware of this policy. Bank employee Neil Kane testified in his deposition that if the loan officer has any income documentation, he cannot "under any circumstances" process the loan as a Stated Income loan. This was corroborated by Bundy's immediate supervisor, Curt Gwaltney. Clay Barnett, the Bank loss prevention officer assigned to investigate Bundy, said that Bundy admitted that he "should have submitted [the loan] as a full doc loan," and that submitting it as a Stated Income loan "was the wrong thing to do." Moreover, Bundy acknowledged in his deposition that he at least had been given "verbal verification" that "if income [information] comes into the building, we are not to use" the Stated Income program, and that he "made an error in the way [he] handled the file." Finally, in Bundy's letter, dated May 8, 2003, Bundy acknowledged that his "mistake was not changing the loan from Stated [Income] to Full [Documentation] before sending the loan to processing. I realize that this was the wrong thing to do, to ignore the tax return." It appears that this issue is primarily relevant to Bundy's claim that the Bank's stated reason for his termination is pretextual; this becomes an issue only if the plaintiff establishes a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Versa*, 45 S.W.3d at 580-81.

In response, the Bank contends that Boyle is not similarly situated to Bundy, because their situations involved different types of loans and different types of policy infractions. The Bank notes that Bundy was terminated for submitting a Stated Income loan application while withholding income documentation at his desk, while Boyle simply submitted an application for a No Income Verification loan on behalf of a retiree who was not eligible for such a loan. Bank employee Linda Bacon testified in her deposition that Bundy "committed what we refer to as an act of dishonesty or a breach of his trust;" in comparison, Boyle's actions did not involve deceit. The Bank further notes that the decision to terminate Bundy's employment was made by Bundy's supervisor, Curt Gwaltney, who was unaware of Boyle's loan or the variance granted to Boyle, and was not involved in any employment decision regarding Boyle. Therefore, the Bank maintains, Boyle is not "similarly situated" to Bundy.

The record indicates "differentiating or mitigating circumstances that would distinguish" Bundy's conduct from Boyle's "or the employer's treatment of them for it." *Versa*, 45 S.W.3d at 581. In contrast to Boyle, Bundy attempted to process a Stated Income loan while he was knowingly withholding income documentation in his desk drawer.[8] His retention of the tax documents came to light only after Underwriting had requested income documentation because of discrepancies in the rental income reported by Bundy's customer. Canaday reported Bundy's conduct to Quality Control, which in turn referred the matter to Corporate Security. The Bank loss prevention officer who investigated the matter testified that this was the second loan of Bundy's that had been referred to his department. In our view, the fact that Bundy's conduct involved a lack of full disclosure to the Bank is quite significant. There is no evidence in the record before us indicating that there was any lack of full disclosure by Boyle in connection with the loan for which she was granted a variance. Indeed, the undisputed evidence shows that Boyle received the variance due to some fault on the part of underwriter Mary Harris. Furthermore, beyond mere conjecture, Bundy has submitted no meaningful evidence to support his assertion that Canaday was involved in a "cover up" of Boyle's conduct.

Under these circumstances, we must conclude that Bundy and Boyle were not similarly situated for purposes of establishing Bundy's *prima facie* case of age and/or sex discrimination. In light of this conclusion, the Bank's treatment of Gravatt becomes irrelevant. Consequently, Bundy has failed to submit sufficient evidence to establish a *prima facie* case of age or sex discrimination. Thus, we find no error in the trial court's grant of summary judgment in favor of the Bank.

---

[8]The Bank contends that Boyle's circumstances are not comparable to Bundy's in part because the loan for which Boyle received a variance was a No income Verification loan, while Bundy's was a Stated Income loan. We saw no evidence in the record indicating that this difference is material.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Jerry Bundy, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE