# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
MAY 26, 2010 Session

## JANICE MADDOX v. TENNESSEE STUDENT ASSISTANCE CORPORATION

**Direct Appeal from the Chancery Court for Davidson County**
**No. 08-578-I      Claudia C. Bonnyman, Chancellor**

---

**No. M2009-02171-COA-R3-CV - Filed July 27, 2010**

---

Employee sued her employer under the Tennessee Human Rights Act, alleging that she was denied a promotion because of her race.  The trial court granted summary judgment to the employer.  We reverse the summary dismissal and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

James L. Harris, Nashville, Tennessee, for the appellant, Janice Maddox

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Steven B. McCloud, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Student Assistance Corporation

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

In 2008, Janice Maddox ("Plaintiff") filed a complaint against her employer, Tennessee Student Assistance Corporation ("TSAC"), alleging that TSAC had discriminated against her in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. Specifically, Plaintiff alleged that she was denied a promotion on the basis of her race, which is African-American.[1] Plaintiff claimed that the "Director of Outreach" position for which she applied was given to a white male who was far less qualified for the position. TSAC filed an answer denying the allegations and subsequently filed a motion for summary judgment.

The following facts were undisputed. Plaintiff holds a bachelor's degree and a master's degree in business administration. She began working for TSAC in 2003 as an Outreach Specialist, which is an entry-level position. Outreach Specialists travel to schools to present information on scholarships and state programs to students and counselors. TSAC had three Outreach Specialists as part of its Communications Division, one for each grand division of the State. Plaintiff was assigned to cover West Tennessee, and she traveled on a weekly basis from her office in Nashville to schools in West Tennessee. In the fall of 2006, TSAC was in the process of reorganizing its Communications Division staff, and the Outreach Specialist positions were to be relocated to regional offices throughout Tennessee. Plaintiff's position would be moved to Memphis, and she would also have to assume more presentation and travel duties "in the field." In October of 2006, the "Director of Outreach" position within the Communications Division in Nashville became vacant. In November, Plaintiff approached TSAC's Associate Executive Director for Communication Services, Ms. Jeri Fields, and advised her that she was interested in the Director of Outreach position. Ms. Fields informed Plaintiff that TSAC was looking for someone with a public relations background and asked if Plaintiff had such a background, and Plaintiff responded that she did not.

Shortly thereafter, TSAC's telephone operator supervisor position also became vacant. Due to the reorganization of the Communications Division, more administrative responsibility would soon fall to the call center where the Telephone Operator Supervisor would be employed. Therefore, TSAC's administration decided to expand that position into a new "Director of Counselor Services" position. Plaintiff was ultimately promoted to Director of Counselor Services at the call center. Another Outreach Specialist, who was a

---

[1] Plaintiff's complaint also alleged discrimination on the basis of age and gender, but she later abandoned those claims.

white male, was ultimately promoted to the Director of Outreach position for which Plaintiff had originally applied. However, the parties presented conflicting evidence regarding the events leading up to these promotions.

TSAC submitted the affidavits of two of its former employees: Ms. Fields, the Associate Executive Director for Communication Services during the relevant time period, and Robert Ruble, its Executive Director at the time. Ms. Fields stated that when Plaintiff originally approached her to express her interest in the Director of Outreach position, Plaintiff had stated that she was "tired of being on the road." Ms. Fields stated that when the new Director of Counselor Services position came about, she felt that Plaintiff would be appropriate for the position because her "strengths were in her administrative abilities with the high schools, colleges, students and parents," and "she could be an asset to have 'in house' dealing with the administrative duties due to her having been with TSAC since the inception of the lottery scholarship program." Ms. Fields said she approached Mr. Ruble about changing the role of the call center supervisor to a professional position and promoting Plaintiff to the position. She said she advised him of Plaintiff's strengths in administration and her desire to stay in Nashville with less travel responsibilities. Ms. Fields stated that Mr. Ruble agreed that Plaintiff should be offered the promotion to Director of Counselor Services. Mr. Ruble similarly stated in his affidavit that after discussing with Ms. Fields Plaintiff's strengths and her desire to stay in Nashville with less travel, he decided that Plaintiff should be offered the promotion to Director of Counselor Services.

Ms. Fields further stated that she spoke to Plaintiff in January of 2007 about TSAC's intention to create the Director of Counselor Services position and advised Plaintiff that the position would be well-suited to her strengths and abilities. According to Ms. Fields, Plaintiff agreed that she was well suited for the position and said that she was interested in the position. Plaintiff stated that she was pleased that the position would allow her to stay in Nashville, with less travel, and with an increased salary of $45,000. At the time, she was earning $41,520. Ms. Fields said she then informed Plaintiff that the process of reclassifying the Telephone Operator Supervisor position to the Director of Counselor Services position would begin soon.

It was undisputed that TSAC interviewed three candidates for the Director of Outreach position in January and February of 2007, and that all three candidates had degrees and experience in public relations.[2] However, TSAC's $42,000 budget for the Director of Outreach position did not meet the salary expectations of the top two candidates. It was also undisputed that TSAC determined that the core responsibilities of the Director of Outreach

---

[2] Plaintiff testified that she was one of four individuals who applied for the position, but Plaintiff was not interviewed. Mr. Seay did not apply for the Director of Outreach position.

would need to change, due to its reorganization of the Communications Division. It was decided that the Director of Outreach would be required to travel because approximately seventy percent of his or her time would be devoted to managing the Outreach Specialists across the State. Certain writing and editing duties previously assigned to the Director of Outreach were delegated to other employees. TSAC then began looking to hire someone with hands-on experience from its current staff with a salary expectation within its budget.

It was undisputed that Plaintiff approached Ms. Fields in mid-February to inquire about the status of the proposed Director of Counselor Services position because she had received an outside job offer, but she did not want to leave state employment because her retirement was not yet vested. According to Ms. Fields, she informed Plaintiff that the paperwork was in progress and that she would be promoted to the Director of Counselor Services position once all approvals were received for the employment changes.

According to Ms. Fields, TSAC management discussed the options for the Director of Outreach position in late February and decided that the new responsibilities assigned to the Director of Outreach would require someone who had proven to be "distinctly aggressive" in the area of "visits and networking of new audiences." Ms. Fields stated that Jason Seay, another Outreach Specialist, was TSAC's "most aggressive outreach employee, especially with his networking and client building abilities." TSAC introduced "trip lists" in an effort to demonstrate Mr. Seay's aggressive job performance. TSAC claimed that its trip lists proved that during fiscal year 2007, Mr. Seay made 445 visits and reached 29,778 people, while Plaintiff made only 102 visits to reach 18,060 people. Ms. Fields and Mr. Ruble said they believed that Mr. Seay could meet the travel expectations of the Director of Outreach position and that his salary expectation was within their budget. They also believed that he could "lead by example" and successfully train and support TSAC's newly hired staff. As such, Mr. Seay was offered the Director of Outreach position, which he accepted, effective March 16, 2007, at an annual salary of $40,008 per year.

According to Ms. Fields, she then told Plaintiff about Mr. Seay's promotion to Director of Outreach. Ms. Fields said she had not discussed the Director of Outreach position with Plaintiff since Plaintiff initially expressed interest in the position in November of 2006. According to Ms. Fields, she told Plaintiff about the Director of Outreach's changed responsibilities and mentioned the fact that Plaintiff had expressed a desire for less travel. She also reiterated her opinion that Plaintiff's strengths were best suited for the Director of Counselor Services position, and the fact that Plaintiff would make $45,000 as the Director of Counselor Services. According to Ms. Fields, Plaintiff agreed that her strengths were more closely aligned with the Director of Counselor Services position.

In May 2007, TSAC received final approval for the new Director of Counselor Services position, and Plaintiff was officially promoted to the new position at an annual salary of $45,000.

Plaintiff disputed various aspects of Ms. Fields' account of what transpired. Plaintiff admitted that Ms. Fields informed her in January of 2007 that a Director of Counselor Services position was being created, but she said "she didn't approach me, as far as wanting it. She was letting us know what changes were about to take place in the office." Plaintiff denied that Ms. Fields discussed her strengths being well suited for the position and stated, "She only said we were having changes in the department, and this is going to be one of them." Plaintiff claimed that when Mr. Seay was ultimately chosen for the Director of Outreach position, Ms. Fields did not explain the reasons for the decision but merely said it was "beyond [her] control." Plaintiff testified that she worked for approximately two months as an Outreach Specialist under Mr. Seay in his capacity as Director of Outreach, and that she was subsequently told by Ms. Fields that if she did not accept the new position of Director of Counselor Services, she would no longer have a job with TSAC. Plaintiff testified that the Director of Counselor Services position was forced upon her, and that it was not a professional position but a telephone operator position.

Plaintiff testified during her deposition that she was more qualified for the Director of Outreach position than Mr. Seay because she had been employed at TSAC for three years, while Mr. Seay had worked there only ten months. In addition, Plaintiff trained Mr. Seay for his position as Outreach Specialist. Plaintiff testified that everyone was aggressive at their jobs, but she disputed the accuracy of the "trip lists" relied upon by TSAC and claimed that she had other documents to prove that he did "nowhere near 400-and-something presentations." She offered to submit those documents as a late-filed exhibit but never did. However, Plaintiff did attempt to explain why Mr. Seay may have had more visits during 2007 than she did. She explained that one "job requirement" for new Outreach Specialists was to visit every school in their territory in order to learn the region and allow contacts to "put a face with the name." She said that such school visits did not include presentations. Plaintiff said that she had to do the same thing when she first began as an Outreach Specialist, but because she had been covering her territory for three years, she was not required to visit every school.

Plaintiff also testified about the salary expectations for the Director of Outreach. She was already earning $41,520 annually as an Outreach Specialist, and the budget for the Director of Outreach position was only $42,000. However, Plaintiff testified that she would have accepted the position at $42,000 because "it was never about the money." She said Ms. Fields was aware of the fact that Plaintiff was interested in the position for its "higher status," recognition, "and the job title."

Plaintiff also discussed her travel expectation. She testified that as Outreach Specialist, she was traveling 85 percent of the time, while the Director of Outreach at the time was only traveling 35 percent of the time. Plaintiff testified that since the reorganization, the current Director of Outreach, Mr. Seay, had been required to travel approximately 50 to 60 percent of the time.

In its motion for summary judgment, TSAC argued that it had demonstrated legitimate, non-discriminatory reasons for failing to promote Plaintiff. In response, Plaintiff argued that there were genuine issues of fact regarding the motive for TSAC's decision. She also claimed that TSAC's stated reasons were pretextual.

The trial court granted summary judgment to TSAC, finding that the legitimate, nondiscriminatory reasons it offered were sufficient to negate an essential element of Plaintiff's discrimination claim, and that Plaintiff had failed to demonstrate that those reasons were pretextual. Plaintiff timely filed a notice of appeal.

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). Assuming that the facts being considered are found in the record and admissible in evidence, the next inquiry is whether a factual dispute actually exists. *Id.* at 514. "If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Id.* (citing *Martin*, 271 S.W.3d at 84; *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993)). "If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law." *Id.* (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999)). Still, not every factual dispute requires the denial of a motion for summary judgment. *Id.* To warrant denial of a motion for summary judgment, the factual dispute must be material, meaning "germane to the claim or defense on which the summary judgment is predicated." *Id.* (citing *Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn. 2008); *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999)).

When the moving party does not bear the burden of proof at trial, it may shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008). "[T]o negate an essential element of the claim, the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Martin*, 271 S.W.3d at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). "If the moving party makes a properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist." *Id.* (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Martin*, 271 S.W.3d at 84. However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). Summary judgment is appropriate "when the undisputed facts, as well as the inferences reasonably drawn from the undisputed facts, support only one conclusion – that the moving party is entitled to a judgment as a matter of law." *Green*, 293 S.W.3d at 513 (citing *Griffis v. Davidson County Metro. Gov't*, 164 S.W.3d 267, 283-84 (Tenn. 2005); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002)).

### III. DISCUSSION

### A.

"The Tennessee Human Rights Act is a comprehensive anti-discrimination statute," *Spann v. Abraham*, 36 S.W.3d 452, 462 (Tenn. Ct. App. 1999), which prohibits discriminatory practices in employment. *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008). It provides that it is a "discriminatory practice" for an employer to fail or refuse to hire any person because of such individual's race, creed, color, religion, sex, age or national origin. **Tenn. Code Ann. § 4-21-401(a)(1).** The Tennessee Human Rights Act was designed to execute "the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, the Pregnancy Amendment of 1978, and the Age Discrimination in Employment Act of 1967, as amended." **Tenn. Code Ann. § 4-21-101(a)(1).** As such, "[t]his Court has construed the Tennessee Human Rights Act under the framework of the federal statutes upon which it was patterned[.]" *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 651 (Tenn. Ct. App. 2001). "The same general analytical framework and allocation of the burden of proof is used for claims under both federal and state statutes,

-7-

irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act." ***Bundy v. First Tenn. Bank Nat'l Ass'n***, 266 S.W.3d 410, 416 (Tenn. Ct. App. 2007) (citing *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003)).

Under the federal anti-discrimination statutes, a plaintiff may assert claims of "disparate treatment" or "disparate impact" discrimination. ***Moore***, 72 S.W.3d at 651 (citing 45C Am. Jur. 2d *Job Discrimination* § 2703 (1993)). "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."[3] ***Ricci v. DeStefano***, 129 S. Ct. 2658, 2672 (2009). Here, Plaintiff alleges disparate treatment. "Disparate-treatment cases present the most easily understood type of discrimination and occur where an employer has treated a particular person less favorably than others because of a protected trait." ***Id.*** (quotations omitted). For this type of claim, the plaintiff must establish that the employer had "a discriminatory intent or motive" for taking the job-related action. ***Id.*** (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). Direct evidence of an employer's discriminatory intent is seldom available to a plaintiff.[4] ***Frame v. Davidson Transit Org.***, 194 S.W.3d 429, 434 (Tenn. Ct. App. 2005). "Recognizing that direct evidence of discriminatory animus is often hard to produce, the United States Supreme Court adopted a four-part, burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792] (1973), which allows a discrimination plaintiff to prove motivation with indirect or circumstantial evidence." ***Moore***, 72 S.W.3d at 651. Tennessee courts now regularly apply the *McDonnell Douglas* analysis in discrimination cases. ***Wilson***, 104 S.W.3d at 50. Under the *McDonnell Douglas* approach, the employee bears the initial burden of presenting evidence establishing a prima facie case of discrimination. ***Id.*** (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999)).

---

[3]   "A 'disparate impact' case is one in which a facially-neutral employment policy, such as an applicant testing procedure or height and weight requirement, has the effect of treating individuals in the protected class less favorably." ***Moore***, 72 S.W.3d at 651. No showing of discriminatory motivation is required in a disparate impact case. ***Id.***

[4]   "Direct evidence of discrimination consists of evidence of an employer's conduct or statements which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions." ***Wilson v. Rubin***, 104 S.W.3d 39, 49 (Tenn. Ct. App. 2002). It includes an acknowledgment by an employer of discriminatory intent. ***Spann***, 36 S.W.3d at 464. However, evidence that can be interpreted as acknowledging discriminatory intent will also suffice "even if it stops short of a virtual admission of illegality." ***Wilson***, 104 S.W.3d at 49. Direct evidence, if believed, establishes the existence of discriminatory intent without any inferences or presumptions. ***Frye v. St. Thomas Health Servs.***, 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007).

"This is an evidentiary standard, not a pleading requirement." *Id.* (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 510-11 (2002)).

To establish a prima facie case of employment discrimination based upon a failure to promote, Plaintiff must prove by a preponderance of the evidence (1) that she is a member of a protected class, such as a racial minority, (2) that she applied for and was qualified for the position, (3) that she was subjected to adverse employment action, *i.e.*, denied the promotion, and (4) that a person outside the protected class received the promotion. *See McDonnell Douglas*, 411 U.S. at 802; *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999); *Moore*, 72 S.W.3d at 651.[5] "Establishing a prima facie case of discrimination creates a rebuttable presumption that the employer unlawfully discriminated against the employee." *Wilson*, 104 S.W.3d at 50 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 68-69 (1st Cir. 2002)). In this case, TSAC admitted, for purposes of summary judgment, that Plaintiff had established a prima facie case of employment discrimination.

Once a plaintiff proves a prima facie case of discrimination, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. In other words, the defendant bears "the burden of producing an explanation to rebut the prima facie case – *i.e.,* the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr.*, 509 U.S. at 506-507 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 507 (quoting *Burdine*, 450 U.S. at 254-55, n.8). However, this burden is one of production, not one of persuasion. *Reeves*, 530 U.S. at 142. "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons."[6] *St. Mary's Honor Ctr.*, 509 U.S. at 510 (citing *Burdine*, 450 U.S. at 254). This

---

[5] The precise requirements for establishing a prima facie case of unlawful discrimination can vary depending on the context, as "[t]hey were 'never intended to be rigid, mechanized, or ritualistic.'" *Wilson*, 104 S.W.3d at 51 (quoting *Furnco Constr. Corp. v. Waters*, 98 S. Ct. 2943, 2949 (1978)). As the Supreme Court noted in *McDonnell Douglas*, 411 U.S. at 802 n.13, the facts "necessarily will vary" in discrimination cases, and the prima facie proof required in one case "is not necessarily applicable in every respect to differing factual situations." Still, the same *general* analytical framework applies "irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act." *Bundy*, 266 S.W.3d at 416.

[6] It is important to note that although burden of production shifts to the defendant, "the ultimate
(continued...)

stage of the analysis "can involve no credibility assessment." *Id.* at 509. "[B]y producing evidence of a nondiscriminatory reason, persuasive or not, defendant meets its burden of production." *Davis v. Reliance Elec.*, 104 S.W.3d 57, 62 (Tenn. Ct. App. 2002) (citing *St. Mary's Honor Ctr.*, 113 S. Ct. at 2747).

If the employer carries its burden of production, "the presumption of discrimination drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 511. However, the plaintiff retains that ultimate burden of persuading the trier of fact that she has been the victim of intentional discrimination. *Id.* at 508. As such, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the employer was not the true reason for its action, but merely a pretext for discrimination. *Marpaka*, 289 S.W.3d at 313; *Moore*, 72 S.W.3d at 652. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 256). The employee may demonstrate that the employer's proffered reasons are pretextual "by revealing the 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation." *Frame*, 194 S.W.3d at 438-39 (quoting *Wilson*, 104 S.W.3d at 50-51). Three of the most common ways of undermining the employer's proffered reasons are by showing that the employer's proffered reasons (1) have no basis in fact, (2) were not really the factors motivating the adverse decision, or (3) even if they were factors, they were jointly insufficient to motivate the decision. *Wilson*, 104 S.W.3d at 51; *Moore*, 72 S.W.3d at 652. An employer's proffered reason has no basis in fact if it is "factually false." *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 581 (Tenn. Ct. App. 2000) (citing *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123-24 (7th Cir.1994)).

**B.**

We now turn to the facts of the case before us. Plaintiff conceded before the trial court that she had no direct evidence of TSAC's discriminatory intent and that she was relying upon the *McDonnell Douglas* analysis to prove discriminatory motivation with indirect or circumstantial evidence. As noted above, TSAC conceded, for purposes of summary judgment, that Plaintiff had established a prima facie case of discrimination by proving: (1) that she is black, (2) that she was qualified for the position of Director of

---

[6](...continued)
burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr.*, 509 U.S. at 507. The burden is not upon the employer to show an absence of discrimination. *Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984). "The employer must simply produce evidence of legitimate non-discriminatory reasons." *Id.* (citing *Bd. of Trustees of Keene State Coll. v. Sweeney*, 99 S. Ct. 295 (1978)).

Outreach, (3) that she was denied the promotion,[7] and (4) that the position was ultimately filled by a white man. However, TSAC claimed that it had carried its burden of production by offering legitimate nondiscriminatory reasons for its decision. TSAC lists the following as nondiscriminatory reasons for its decision:

> There was another employee on TSAC's staff, Mr. Seay, who had proven to be TSAC's most aggressive outreach employee, especially with his networking and client building abilities. TSAC believed that Mr. Seay could best meet the new expectations for travel and networking to train and support the soon to be hired staff. TSAC staff believed that Mr. Seay would be the best employee to lead by example. The position was budgeted at $42,000 per year and was within the salary expectation of Mr. Seay.

> TSAC believed that Plaintiff's strengths were in her administrative abilities with high schools, colleges, students, and parents and that she could best be utilized as an asset to have in-house dealing with administrative duties due to her having been with TSAC since the inception of the lottery scholarship program. The Director of Outreach position required extensive travel and Plaintiff had expressed a desire for less travel and a higher salary than was budgeted for the Director of Outreach position. Plaintiff was determined to be more qualified for the Director of Counselor Services position within TSAC, a position that paid a higher annual salary and did not require travel.

We readily conclude that TSAC carried its burden of "producing evidence" that its action was taken for a legitimate, nondiscriminatory reason.[8] *See **St. Mary's Honor Ctr.***, 509 U.S. at 506-507. TSAC "clearly set forth, through the introduction of admissible evidence,

---

[7] We note that TSAC did not argue that Plaintiff was not subjected to an adverse employment action, even though she was promoted to another position with a higher salary. An employee's "purely subjective preference for one position over another" will not suffice. ***Frye***, 227 S.W.3d at 611. However, "a material and adverse change in the terms and conditions of employment" is sufficient, such as a "demotion evidenced by . . . a less distinguished title[;] or a significant reduction of material responsibilities." ***Id.*** at 610.

[8] Plaintiff argues on appeal that TSAC's proffered reasons are based "on matters of perception which cannot be the basis for the granting of summary judgment." In ***Moore***, 72 S.W.3d at 652, the plaintiff similarly argued that whether legitimate nondiscriminatory reasons existed was an issue of material fact that was not appropriate for summary judgment. The Court explained that the plaintiff's position was "a misinterpretation of the *McDonnell Douglas* burden-shifting analysis." ***Id.*** Again, the employer's burden at this stage is "one of production, not one of persuasion." ***Wilson***, 104 S.W.3d at 50. "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons," and there is no credibility assessment at this point of the analysis. ***St. Mary's Honor Ctr.***, 509 U.S. at 510.

reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 507.

The issue before us, then, is whether Plaintiff sufficiently demonstrated that those reasons were pretextual. "In order to survive summary judgment under the *McDonnell Douglas* analysis, a plaintiff must offer some evidence to prove that the employer's legitimate, non-discriminatory reasons are pretext for discrimination." *Moore*, 72 S.W.3d at 652. Because we are at the summary judgment stage, "'the plaintiff need not totally refute the defendant's assertions as to its reasons for its actions, but must present some evidence, whether direct or circumstantial, that is sufficient to create a genuine issue of material fact as to the motivations of the defendant.'" *Bundy*, 266 S.W.3d at 417 (quoting *Dennis*, 119 S.W.3d at 694). A successful challenge to the employer's stated reason negates the defense claimed. *Frame*, 194 S.W.3d at 440. "[I]f the plaintiff succeeds in making the employer's stated non-discriminatory reason a disputed fact, then it is up to the fact-finder to resolve the factual dispute as well as the ultimate question – whether the employer discriminated against the employee." *Id.* at 439. "'If the only reason an employer offers for [its action] is a lie, the inference that the real reason was a forbidden one . . . may rationally be drawn. This is the common sense behind the rule of *McDonnell Douglas*. The point is only that if the inference of improper motive *can* be drawn, there must be a trial.'" *Versa*, 45 S.W.3d at 582 (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990)).

As noted above, Plaintiff challenged TSAC's suggestion that Mr. Seay was its most aggressive outreach employee by testifying that its "trip lists" included inaccurate information and by testifying that Mr. Seay only had more "visits" than she did because he was a new Outreach Specialist who was required to travel to all of the schools in his territory. She testified that these visits would not have included presentations. With regard to TSAC's contention that it believed Mr. Seay could best train the "soon-to-be hired staff," Plaintiff stated that it was unclear as to whom TSAC was referring, as the department consisted of only a few employees. However, she stated that she had previous experience in hiring and training, and that Mr. Seay had never worked in a supervisory role according to his resume. She also testified that it was she who trained Mr. Seay. Plaintiff also disputed TSAC's suggestion that she would not have accepted the position because of its travel responsibilities and lower salary. Plaintiff's affidavit stated that she "had no problem with the travel expectation of this job," and that she was aware of the travel requirement when she applied for the position.[9] Regarding the salary, Plaintiff similarly stated that she was "well aware"

---

[9] TSAC contends that there is a conflict between Plaintiff's affidavit and her response to TSAC's statement of undisputed facts regarding whether she desired a job with less travel. "Issues of witness credibility present issues of fact and must be construed in favor of a nonmoving party when considering a
(continued...)

of the salary when she applied and that she never asked for the position's salary to be increased. Plaintiff testified that "it was never about the money." Finally, regarding TSAC's contention that Plaintiff's strengths were well-suited for the Director of Counselor Services position, Plaintiff stated that the abilities mentioned by TSAC were also those stated in the job description for the Director of Outreach. She stated that the posted job description required someone with three to five years of professional experience in public relations, outreach and communication, and she contended that she had such experience while Mr. Seay did not.[10]

We reiterate that the issue before the Court at this stage is not whether Plaintiff was discriminated against because of her race. The issue is whether she has created a genuine issue of material fact. On a motion for summary judgment, Plaintiff was not required to "totally refute the defendant's assertions as to its reasons for its actions." *Bundy*, 266 S.W.3d at 417. It was only necessary for her to "present some evidence, whether direct or circumstantial, that is sufficient to create a genuine issue of material fact as to the employer's motivations." *Bundy*, 266 S.W.3d at 417. "If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Green*, 293 S.W.3d at 514. Considering the evidence in the light most favorable to Plaintiff, as we are required to do at the summary judgment stage, we find that she has demonstrated a genuine issue of material fact by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in her employer's explanation. *See Frame*, 194 S.W.3d at 438. Plaintiff's evidence is sufficient to permit a rational factfinder to conclude that TSAC's proffered reasons were pretextual. *See Versa*, 45 S.W.3d at 581. Thus, summary judgment was not appropriate.

Again, we are not determining that Plaintiff is entitled to prevail on her claim for employment discrimination.[11] We have merely found that she raised genuine issues of

---

[9](...continued)
motion for summary judgment." *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ.*, 244 S.W.3d 302, 320 (Tenn. 2007). The alleged inconsistencies in Plaintiff's evidence do not compel a grant of summary judgment in TSAC's favor. These are issues for the trier of fact to consider.

[10] We note that the issue is not whether TSAC's decision was sound, but whether the asserted reason for its decision was pretextual. *Versa*, 45 S.W.3d at 582. However, the reasonableness of an employer's decision may be considered insofar as it illuminates the employer's motivations. *Id.*

[11] Even if TSAC's proffered reasons are ultimately rejected by the factfinder, that does not compel a judgment for Plaintiff. *See Reeves*, 530 U.S. at 146. The factfinder's disbelief of an employer's proffered reasons *may*, together with the elements of the prima facie case, suffice to show intentional discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 511. "Thus, rejection of the defendant's proffered reasons will *permit*
(continued...)

material fact as to her claim, which make summary judgment inappropriate.

## IV.  CONCLUSION

For the aforementioned reasons, we reverse the order of the chancery court and remand for further proceedings.  Costs of this appeal are taxed to the appellee, Tennessee Student Assistance Corporation, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

[11](...continued)
the trier of fact to infer the ultimate fact of intentional discrimination," and "[n]o additional proof of discrimination is *required.*" **Id.**  However, "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct." **Id.** at 524.  "In other words, it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." **Reeves**, 530 U.S. at 147 (quotation omitted).