# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 25, 2012 Session

## MELODY PIERCE (FORMERLY STEWART)
### v.
## CITY OF HUMBOLDT, TENNESSEE

**An Appeal from the Circuit Court of Gibson County**
**No. H3774     Clayburn Peeples, Judge**

**No. W2012-00217-COA-R3-CV - Filed March 25, 2013**

This appeal involves alleged employment discrimination based on gender and pregnancy. The female plaintiff was employed as a police officer by the defendant city. While off duty, the plaintiff encountered an ex-boyfriend against whom she had procured an order of protection. Based on this encounter, she filed a criminal charge against the ex-boyfriend for violating the order of protection. The defendant's police chief ordered an internal affairs investigation, and the ex-boyfriend filed criminal charges against the plaintiff for filing a false charge. The plaintiff was suspended with pay pending resolution of the criminal charges. Soon after that, the plaintiff informed the police chief that she was pregnant. After the ex-boyfriend's criminal charges against the plaintiff were dropped, the police chief terminated the plaintiff's employment based on the results of the internal affairs investigation. The termination was upheld by the city's mayor and its board of aldermen. The plaintiff filed this lawsuit against the employer city, alleging discrimination based on gender and pregnancy pursuant to the Tennessee Human Rights Act. The employer city filed a motion for summary judgment, asserting that the plaintiff had no credible evidence that she was treated less favorably than similarly situated male employees. The trial court granted summary judgment in favor of the employer city. The plaintiff now appeals. We reverse, finding that the standard for summary judgment under ***Hannan v. Alltel Publishing Company*** and ***Gossett v. Tractor Supply Company*** has not been met in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is**
**Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Justin S. Gilbert and Jonathan L. Bobbitt, Jackson, Tennessee, for the Plaintiff/Appellant Melody Pierce (formerly Stewart)

Geoffrey A. Lindley and John D. Burleson, Jackson, Tennessee, for the Defendant/Appellee City of Humboldt, Tennessee

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background[1]

In July 2006, Plaintiff/Appellant Melody Pierce (formerly Stewart)[2] interviewed with Police Chief Raymond Simmons ("Chief Simmons") for a job with the Humboldt Police Department of the Defendant/Appellee City of Humboldt, Tennessee ("City"). During the interview, Chief Simmons asked Ms. Pierce how many children she had and whether she planned to have more. He commented that "basically there's nowhere for pregnant officers to work," and that she "couldn't be in a patrol car pregnant." At the time of the interview, Ms. Pierce had been married and divorced twice.[3] She told Chief Simmons that she had three children, and that she had no plans to have more. Chief Simmons commented to Ms. Pierce that another female police officer had been promiscuous and had become involved in relationships with other officers, and he warned Ms. Pierce that he did not want that to happen again.

Ms. Pierce was hired as a police officer for the City. She primarily worked the third shift, from 11:00 p.m. to 7:00 a.m.

---

[1] In this appeal, we review the trial court's grant of summary judgment. Consequently, we outline the facts largely as alleged by the nonmovant. In this case, the moving party disputes many of the facts as asserted by the nonmovant. On appeal, however, we are required to review the facts in the light most favorable to the nonmovant and assume all credibility determinations in favor of the nonmovant, so we must focus on the nonmovant's version of facts. *Stovall v. Clarke*, 13 S.W.3d 715, 721 (Tenn. 2003).

[2] Ms. Pierce filed this lawsuit under her married name at the time, Melody Stewart. After the lawsuit was filed, she was divorced from Mr. Stewart, and she began to use the surname "Pierce." In this opinion, we refer to the plaintiff as "Ms. Pierce."

[3] It appears that Ms. Pierce's divorce from her second husband was finalized around the time she started working for the police department.

In November 2008, a chain of events began that ultimately led to the termination of Ms. Pierce's employment. A former friend of Ms. Pierce, Wayne Kendall ("Mr. Kendall"), began harassing Ms. Pierce in the course of pursuing a romantic relationship with her.[4] Because of this, fellow police officer Hunter Stewart ("Mr. Stewart") sometimes picked Ms. Pierce up at her home and drove her to and from work.

On the evening of November 29, 2008, Mr. Stewart was inside Ms. Pierce's home, along with Ms. Pierce's three children. Both Mr. Stewart and Ms. Pierce were dressed in their police uniforms. Mr. Kendall began to attempt to break into Ms. Pierce's home through a window. Mr. Stewart and Ms. Pierce went outside to prevent Mr. Kendall from breaking in, and Mr. Stewart and Mr. Kendall became engaged in a physical altercation. When Mr. Kendall grabbed for Mr. Stewart's gun, Ms. Pierce shot Mr. Kendall in the hip. The incident was the subject of local news coverage.

As a result of the incident, Ms. Pierce went to the Gibson County general sessions court on December 4, 2008, and obtained an order of protection against Mr. Kendall, enjoining him from "having any contact" with her for one year. Despite the order of protection, according to Ms. Pierce, Mr. Kendall continued to stalk her, driving through the police station parking lot to see if her car was there and calling the police station to try to obtain her work schedule. This was so troubling to Ms. Pierce that she stopped parking her patrol car in the police parking lot so that Mr. Kendall would not know whether she was at work. One evening, Mr. Kendall sent Ms. Pierce a text message from someone else's cell phone, indicating that he was watching her and knew where she was. Ms. Pierce reported the ominous text to her sergeant.

Soon after the November 2008 incident, the friendship between Ms. Pierce and Mr. Stewart became a romantic relationship. As a result, in January 2009, Ms. Pierce became pregnant with Mr. Stewart's child. Ms. Pierce and Mr. Stewart married in February 2009. Another pivotal incident occurred on January 14, 2009. That morning, Ms. Pierce went to a local Walmart store just after she got off duty. Unbeknownst to Ms. Pierce, Mr. Kendall was shopping in the store at that time.[5] When Ms. Pierce saw Mr. Kendall inside Walmart, she "panicked" because Mr. Kendall had previously stalked her and her children at a Walmart. Ms. Pierce telephoned Mr. Stewart, who was off duty; he told her to stay away from Mr. Kendall. Mr. Stewart then called the police to go to the Walmart store.

---

[4]Mr. Kendall maintained that he and Ms. Pierce had been involved in a romantic relationship. Ms. Pierce denied this.

[5]Store surveillance footage indicated that Mr. Kendall had been at the Walmart store before Ms. Pierce.

Police officers Machell Martin ("Officer Martin")[6] and Carlos Clark ("Officer Clark") responded to Mr. Stewart's call and went to the Walmart store. Officer Martin later reported that, as she was arriving, she saw Ms. Pierce "running" from the store. When the officers asked Ms. Pierce what was going on, Ms. Pierce told them that Mr. Kendall had been following her around inside the store, and that he was watching the store exits to prevent her from leaving. Chief Simmons and Assistant Chief Bill Baker ("Assistant Chief Baker") came to Walmart at about the same time; Ms. Pierce told them that she felt that Mr. Kendall was following her inside the store.

Ms. Pierce claims that Officer Clark told her that same day that he was not going to file a report for the incident. Officers Clark and Martin did, however, file an incident report; it indicated that Mr. Kendall checked out of the Walmart store with several bags of merchandise. The officers reported that they spoke to Mr. Kendall when he left Walmart; he denied that he was following Ms. Pierce and said that, when he saw Ms. Pierce in the store, "he looked the other way, continued shopping, and did not say anything to [her]." The officers believed Mr. Kendall's account, so they told him that he was not in violation of the order of protection and that he was free to leave.

On the same day, Ms. Pierce contacted her attorney, Cynthia Snell ("Ms. Snell"), and told her about her encounter with Mr. Kendall at the Walmart store. Ms. Pierce told Ms. Snell that the officers were not going to file a police report on the incident, so Ms. Snell advised Ms. Pierce to ask Judge Mark Agee, the general sessions judge who entered the order of protection against Mr. Kendall, "what kind of record to make" about the incident.

Pursuant to Ms. Snell's advice, Ms. Pierce visited Judge Agee and told him about her encounter with Mr. Kendall at Walmart. Judge Agee suggested that Ms. Pierce fill out a general sessions "Affidavit of Complaint" to get an arrest warrant issued for Mr. Kendall for violating the December 2008 order of protection. Following Judge Agee's suggestion, Ms. Pierce signed a general sessions affidavit that asserted that Mr. Kendall "followed her around Wal-Mart . . . and watched the doors so she couldn't leave." It alleged that Mr. Kendall's contact with her was "in violation of" the order of protection.

As a result of Ms. Pierce's general sessions affidavit of complaint, Mr. Kendall was arrested. He posted bond and was released. As with the November 2008 incident, the arrest was the subject of local news media coverage.

After the Walmart incident, Chief Simmons reviewed the Walmart surveillance video of Ms. Pierce and Mr. Kendall while they were in the Walmart store, listened to the police radio

---

[6]Ms. Pierce and Officer Martin reportedly had a history of "personal difficulties."

-4-

traffic about the incident, and read Ms. Pierce's general sessions affidavit of complaint. These things convinced Chief Simmons that the version of events in Ms. Pierce's sworn affidavit was not true. Chief Simmons then invited District Attorney General Garry Brown ("District Attorney Brown") to view the surveillance video. After District Attorney Brown did so, he apparently reached the same conclusion as Chief Simmons and asked that the charges against Mr. Kendall be dismissed for lack of probable cause. On January 28, 2009, the affidavit of complaint signed by Ms. Pierce was dismissed.

Subsequently, Chief Simmons ordered an internal affairs investigation of the Walmart incident, to be conducted by Assistant Chief Baker. Assistant Chief Baker took statements from several officers, including Chief Simmons, Mr. Stewart, Officer Clark, and Officer Martin, as well as a statement from Ms. Pierce.

On February 18, 2009, Mr. Kendall filed two separate criminal complaints against Ms. Pierce, one for the November 2008 shooting incident and one for filing a false affidavit against him in general sessions court. Two days later, Chief Simmons suspended Ms. Pierce with pay. According to Ms. Pierce, Chief Simmons told her that she would be suspended until the criminal charges filed against her were dismissed, and after that she could return to work.

Subsequently, Ms. Snell contacted Chief Simmons and asked him whether Ms. Pierce would continue to receive health benefits during her suspension; she explained to him that the health benefits were important because Ms. Pierce was two months pregnant. Chief Simmons told Ms. Snell that "[t]here was nothing for [Ms. Pierce] to do while [she] was pregnant," and that "there was nowhere for [Ms. Pierce] to go." When Ms. Snell asked Chief Simmons if Ms. Pierce "could possibly have a desk job or . . . [work in] dispatch or anything," Chief Simmons said no. Chief Simmons never said anything directly to Ms. Pierce about her pregnancy.

Eventually, the criminal charges Mr. Kendall filed against Ms. Pierce were dismissed. Despite the dismissal of the charges, Ms. Pierce was not reinstated to her position. Instead, she remained on suspension with pay while the internal affairs investigation proceeded.

On March 20, 2009, Assistant Chief Baker issued a "Statement of Charges" against Ms. Pierce. In the Statement, Assistant Chief Baker concluded that the Walmart surveillance video did "not support the contentions Officer Pierce made to me, Chief Simmons, Officer Martin, or in the affidavit filed in the Gibson County General Sessions Court." He noted that District Attorney Brown directed the dismissal of the warrant against Mr. Kendall for lack of probable cause after he reviewed the Walmart surveillance video. Assistant Chief Baker asserted that Ms. Pierce's act of filing of a false affidavit violated the Police Department

Code of Ethics requirement that officers must "be honest in thought and deed in . . . personal and official life," the Code of Ethics prohibition against making "a false official statement," and the prohibition in the City personnel policies and procedures against "falsifying personal or city records . . . ."  Assistant Chief Baker said that District Attorney Brown "is of the opinion that this incident seriously affects the credibility of Officer Pierce and limits her effectiveness and use as a prosecuting witness in a criminal matter."  The Statement of Charges concluded with a recommendation that Ms. Pierce's employment as a City police officer be terminated.

Chief Simmons conducted a hearing on the statement of charges against Ms. Pierce.  Ms. Pierce and her attorney were present at the hearing.  After the hearing, Chief Simmons took the matter under advisement.  On April 3, 2009, Chief Simmons issued a memo describing his findings of fact from Assistant Chief Baker's statement of charges and the evidence submitted at the hearing.  Chief Simmons found that Ms. Pierce had filed a false affidavit of complaint against Mr. Kendall, and that this act damaged her credibility, "her effectiveness to serve as a member of the Humboldt Police Department," and her ability to serve as "a prosecuting witness" in future cases involving the department, particularly in light of the negative publicity surrounding the incidents.  In agreement with Assistant Chief Baker, Chief Simmons concluded that Ms. Pierce's conduct violated the police department's rules and policies, and that the seriousness of her offense warranted termination.  Accordingly, Chief Simmons terminated Ms. Pierce's employment with the police department.

Ms. Pierce appealed Chief Simmons's  decision to Humboldt's mayor.  The mayor held a hearing and then affirmed Chief Simmons's decision.  Ms. Pierce appealed the decision further to the City's board of aldermen, which affirmed it as well.

**Lawsuit**

On August 20, 2009, Ms. Pierce filed this lawsuit against the City in the Circuit Court for Gibson County, Tennessee. She asserted numerous claims in her complaint, including employment discrimination on the basis of gender and pregnancy, in violation of the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101 *et seq*. Ms. Pierce later amended her complaint to limit her claims to those based on sex and pregnancy discrimination.  She alleged that her gender and/or her pregnancy were motivating factors in the City's decision to terminate her employment after the criminal charges against her were dismissed.  She further alleged that "the City treated Plaintiff, a pregnant female officer, differently than it treats male officers who "were arrested *and/or who were even convicted* of crimes which damaged their credibility . . . to far greater degrees than Plaintiff," and that the male officers were not terminated despite their offenses.  The complaint sought compensatory damages, including damages for emotional harm.  It also sought reinstatement

to Ms. Pierce's job, and damages for the amount of her prenatal care, which would have been covered by her job-related health insurance had her employment not been terminated.

Discovery ensued. Ms. Pierce sought to prove that similarly situated male officers who committed infractions that implicated their credibility were not terminated, and thus were treated more favorably than she. Ms. Pierce compared her situation to that of four fellow officers: Jonathan Cook, Paul Carrier, Allen Baker, and her ex-husband Hunter Stewart. There was little direct evidence of the offenses committed by the comparators, but the record contains testimony by Chief Simmons and Ms. Pierce about their knowledge of the compared officers' infractions and punishments. It showed the following:

Jonathan Cook: Mr. Cook shot himself in the foot to avoid being deployed to Iraq, but he reported that the wound was inflicted by someone else. Chief Simmons did not commence an internal affairs investigation. Mr. Cook was indicted for filing a false police report. When the indictment was issued, he was suspended without pay pending the conclusion of the criminal proceedings, but he continued to receive medical benefits. The criminal proceedings were pending at the time discovery was taken in this case. Chief Simmons claimed that, even if Mr. Cook is acquitted, an internal affairs investigation will be commenced.

Paul Carrier (two offenses): (1) Mr. Carrier lied about having possession of a City radar gun. The radar gun was Mr. Carrier's "favorite radar" and he did not want other officers using it, so he brought it home with him. After Mr. Carrier said that someone stole the radar gun, he brought it to work every day and used it. When this was discovered, Mr. Carrier was not punished, but instead received a "write up" for his conduct.

(2) After the radar gun incident, Mr. Carrier shot a man while on duty. No internal affairs investigation was commenced. Mr. Carrier was later indicted for reckless homicide. He was suspended without pay pending resolution of the criminal charge, but he continued to receive medical benefits. After Mr. Carrier was convicted of reckless homicide, he was permitted to resign rather than face termination. Chief Simmons claimed that, had Mr. Carrier not resigned, he would have ordered an internal affairs investigation.

Allen Baker: Ms. Pierce testified that Mr. Baker disabled the GPS systems in police cars so that his whereabouts could not be detected, and then later lied about having done so. She asserted that the City knew about Mr. Baker's conduct but nevertheless did not terminate his employment or even punish

him. The City responded that Ms. Pierce had no proof of her allegations about Mr. Baker.

> Hunter Stewart:  Mr. Stewart was found guilty by a juvenile court of severely abusing the infant born to him and Ms. Pierce. When the child was 11 months old, Mr. Stewart broke the child's leg and rib and caused brain hemorrhaging. As of the time of Chief Simmons' deposition, Mr. Stewart was still working for the City and Chief Simmons had not yet ordered an internal affairs investigation. The record indicates that Mr. Stewart later resigned before any internal affairs investigation had begun.

In contrast to how she was treated by the City, Ms. Pierce alleged, the City did not commence an internal affairs investigation immediately upon learning of the misconduct of any of these male officers. Also, for Ms. Pierce, Chief Simmons afforded her no credibility and discounted her explanation for her actions. In addition, contrary to Chief Simmons's assurance, Ms. Pierce was not reinstated to her position when the criminal charges against her were dropped. The difference, she asserted, was that in the interim, Chief Simmons learned that Ms. Pierce was pregnant; she asserted that this was the reason that he ultimately decided to terminate her employment.

The City filed a motion for summary judgment alleging that, based on the undisputed facts, Ms. Pierce could not establish the element of causation for either her sex discrimination or her pregnancy discrimination claim. The City argued that the allegedly similarly situated male officers cited by Ms. Pierce did not engage in the same misconduct as hers and were not treated more favorably than Ms. Pierce. The City contended that the pregnancy-related comments allegedly made by Chief Pierce during Ms. Pierce's 2006 interview and to Ms. Pierce's attorney after her suspension were not relevant to Ms. Pierce's claim of pregnancy discrimination. The City also pointed out that it was Assistant Chief Baker — not Chief Simmons — who initially recommended the termination of Ms. Pierce's employment, and Ms. Pierce presented no evidence that Assistant Chief Baker was aware of Ms. Pierce's pregnancy at the time he made that recommendation. Therefore, the City argued, Chief Simmons' pregnancy-related statements did not constitute direct evidence of discrimination. Finally, the City noted that there was no evidence that the City's mayor or board of aldermen were "influenced by any improper motive" in affirming the termination of Ms. Pierce's employment.

In response, Ms. Pierce asserted that the City had not presented "undisputed evidence" of an "exclusive" nondiscriminatory motivation for terminating her employment, as is required to obtain summary judgment under the standard in ***Gossett v. Tractor Supply***, 320 S.W.3d 777 (Tenn. 2010). Ms. Pierce also argued that the male officers compared to Ms. Pierce were in

fact similarly situated, yet none were the subject of an internal investigation and none were recommended for termination. She insisted that Chief Simmons' anti-pregnancy comments, both to Ms. Pierce in her job interview and to her lawyer, were evidence of discriminatory motive and showed a causal link between the announcement of Ms. Pierce's pregnancy and the termination of her employment, particularly in light of the temporal proximity between Ms. Snell's disclosure to Chief Simmons of Ms. Pierce's pregnancy and her termination. Ms. Pierce also noted that Chief Simmons assured her that she would be reinstated to her job after the criminal charges against her were resolved, but he then changed his position and terminated her employment after he found out that she was pregnant.

**Trial Court Decision**

On December 5, 2011, the trial court conducted a hearing on the City's motion for summary judgment. At the conclusion of the hearing, it granted the City's motion. The trial court held that the male officers cited as comparators by Ms. Pierce were not sufficiently similar to Ms. Pierce; it felt that her misconduct was more serious because it impacted the integrity of the police department and resulted in the arrest of an innocent person. In its oral ruling, the trial court explained:

> [A]ctions that falsely accuse innocent people of crimes are more serious in a very significant and substantive way when they're committed by people who have an almost exclusive right to charge people with crimes, *i.e.*, people who work for police departments.
> I think the comparisons the plaintiff advances are all serious matters, but they don't call the integrity of the police department into question the way making a false accusation against someone does, and her actions did. I don't see how any police department anywhere in America could keep such a person in its employ.
> I'm granting the City's motion.

On January 5, 2012, the trial court entered a written order with slightly different reasoning, holding that the City had affirmatively negated the element of causation by submitting undisputed evidence of its legitimate nondiscriminatory reason for terminating her employment. The trial court stated:

> [T]his Court finds that the City has affirmatively negated the element of causation in Plaintiff's claims of gender and pregnancy discrimination. The undisputed evidence shows that the City's legitimate reason for terminating Plaintiff's employment . . . was that the City determined that Plaintiff filed a

false sworn affidavit against a citizen which resulted in the arrest of that citizen and rendered Plaintiff incredible to testify as a police officer.

The written order did not include any mention of the comparator evidence to which the trial court had referred in its oral ruling, but the oral ruling was attached to and incorporated by reference in the written order. From this order, Ms. Pierce now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Ms. Pierce argues that the trial court erred in granting summary judgment in favor of the City. Ms. Pierce raises two specific issues:

1. Whether, by failing to set forth an "exclusive reason" for Ms. Pierce's termination, the City failed to meet its summary judgment burden under **Gossett**?

2. Whether, even if the City satisfied its "exclusive reason" burden, it failed to draw opposing, or additional, inferences of causation by rejecting evidence offered by Ms. Pierce related to:
     a. similarly situated employees being treated less harshly;
     b. temporal proximity between the discovery of her pregnancy and her termination;
     c. evidence of prejudice against pregnant police officers; and
     d. evidence showing that the City's proffered reason for terminating her was false?

Our review of the trial court's decision to either grant or deny a motion for summary judgment is a question of law, subject to *de novo* review, with no presumption of correctness in the trial court's decision. **Gossett**, 320 S.W.3d at 780; **see also Kinsler v. Berkline, LLC**, 320 S.W.3d 796, 799 (Tenn. 2010). Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.03.

The standard to be applied in this employment discrimination case is the summary judgment standard announced in **Hannan v. Alltel Publishing Co.**, 270 S.W.3d 1 (Tenn. 2008). **See Gossett**, 320 S.W.3d at 781-83 (rejecting the **McDonnell Douglas** framework at the summary-judgment stage in discriminatory and retaliatory discharge cases and applying the standard in **Hannan**); **see also Perkins v. Metro. Gov't Nashville**, 380 S.W.3d 73, 79 n.8 (Tenn. 2012) (recognizing the holding in **Gossett** "that the burden-shifting framework of

-10-

*McDonnell Douglas* does not apply at the summary judgment stage in Tennessee").[7]  The Tennessee Supreme Court recently expounded on the *Hannan* standard:

> In *Hannan*, this Court reaffirmed the basic principles guiding Tennessee courts in determining whether a motion for summary judgment should be granted, stating:
>
> > The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Byrd*, 847 S.W.2d at 215.  If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Id.* . . .
> >
> > . . . [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.
>
> *Hannan*, 270 S.W.3d at 5, 8-9.  It is insufficient for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." *Id.* at 10.  "Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).  If the party moving for summary judgment fails to satisfy its initial burden of production, the burden does not shift to the nonmovant and the court must dismiss the motion for summary judgment. *Hannan*, 270 S.W.3d at 5; *Blanchard v. Kellum*, 975 S.W.2d 522, 525 (Tenn. 1998).

*Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 25-26 (Tenn. 2011).

---

[7]The Tennessee General Assembly has enacted legislation providing for a different summary judgment standard than the standard set forth in both *Gossett* and *Hannan*, but the new statutes only apply to cases filed on or after June 10, 2011 and July 1, 2011, respectively.  *See* Tenn. Code Ann. § 4-21-311(e), 50-1-304(g) (setting forth burden of proof in discrimination cases); Tenn. Code Ann. § 20-16-101 (setting forth a new summary judgment standard in other cases).

As this Court observed in *Skaan v. Federal Exp. Corp.*, "the standard for summary judgment under the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co*. is high indeed." *Skaan v. Federal Exp. Corp.*, No. W2011-01807-COA-R3-CV, 2012 WL 6212891, at *5 (Tenn. Ct. App. Dec. 13, 2012). In order to obtain a grant of summary judgment in an employment discrimination case, the movant employer "must produce evidence or refer to evidence in the record 'that affirmatively negates an essential element of the [employee's] claim or shows that the [employee] cannot prove an essential element of the claim at trial.'" *Gossett*, 320 S.W.3d at 782 (quoting *Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 631 (Tenn. 2009) (citing *Hannan*, 270 S.W.3d at 8-9)); *see also McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). In order for the employer to affirmatively negate an essential element of the employee's claim, it "must point to evidence that tends to disprove a material factual allegation made by the [employee]." *Gossett*, 320 S.W.3d at 782 (citing *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008)). If there are disputed facts, we must ascertain whether they are material to an essential element of the employee's claim or to an element of the affirmative defense upon which the employer seeks to rely. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

## ANALYSIS

"The Tennessee Human Rights Act is a comprehensive anti-discrimination statute" that prohibits discriminatory practices in employment. *Spann v. Abraham*, 36 S.W.3d 452, 462 (Tenn. Ct. App. 1999); *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008). Under the Act, terminating employment based on the employee's sex is a "discriminatory practice" that is prohibited by the THRA. *See* Tenn. Code Ann. § 4-21-401(a)(1). The THRA was designed to execute the policies embodied in the federal Civil Rights Acts of 1964, 1968, and 1972, including the Pregnancy Discrimination Act of 1978 ("PDA"). *Spann*, 36 S.W.3d at 463 (citing Tenn. Code Ann. § 4-21-101(a)(1)). As such, "[t]his Court has construed the Tennessee Human Rights Act under the framework of the federal statutes upon which it was patterned[.]" *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 651 (Tenn. Ct. App. 2001). "The same general analytical framework and allocation of the burden of proof is used for claims under both federal and state statutes, irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act." *Bundy v. First Tenn. Bank Nat'l Ass'n*, 266 S.W.3d 410, 416 (Tenn. Ct. App. 2007) (citing *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003)).

"The PDA amended Title VII by providing that the terms 'because of sex' or 'on the basis of sex' in Title VII shall include 'on the basis of pregnancy, childbirth or related medical conditions.'" ***Spann***, 36 S.W.3d at 463. The appellate court in ***Spann*** noted that the PDA did not include new substantive provisions regarding discrimination based on pregnancy; nevertheless, a pregnancy discrimination claim is treated in a manner similar to a claim of discrimination based on temporary disability:

> [The PDA] provided no new substantive rules governing discrimination based on pregnancy but rather brought discrimination on the basis of pregnancy within the existing Title VII statutory framework prohibiting employment discrimination based on sex. Thus, PDA claims are analyzed just like any other Title VII discrimination claim.
>
> . . .
>
> Pregnancy under the PDA is to be treated just like any other temporary disability. Thus, employees who are able to work must be permitted to work on the same conditions as other employees, and pregnant employees who are unable to work must be accorded the same leave and fringe benefits provided to other employees who are temporarily unable to work.

***Spann***, 36 S.W.3d at 463-64. "Under the PDA, an unlawful employment practice occurs whenever pregnancy alone is a motivating factor for an adverse employment action." ***Id.*** at 464.

The trial court granted summary judgment in favor of the City on Ms. Pierce's claims of sex and pregnancy discrimination. Under the ***Hannan*** standard, as a threshold issue, we must ascertain whether the City shifted the burden of production to Ms. Pierce, either by affirmatively negating an essential element of each of her claims or by showing she cannot prove an essential element of her claims at trial. ***Hannan***, 270 S.W.3d at 5, 8-9.

To make out a prima facie claim of sex discrimination, the plaintiff must establish four elements: (1) the plaintiff is a member of the protected class, (2) she suffered an adverse employment action, (3) she was qualified for the job position at issue, and (4) she was either replaced by a person outside of the protected class *or* was treated less favorably than a similarly situated employee who is not a member of the protected class. ***Hartman v. Tennessee Bd. of Regents***, No. M2010-02084-COA-R3-CV, 2011 WL 3849848, at *7 (Tenn. Ct. App. Aug. 31, 2011) (citing ***Clayton v. Meijer, Inc.***, 281 F.3d 605, 610 (6th Cir. 2002)); ***see also Bundy***, 266 S.W.3d at 417; ***Dennis***, 119 S.W.3d at 693. To prove pregnancy discrimination by the indirect method, the plaintiff must establish four elements:

-13-

(1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment action; and (4) there is a nexus between her pregnancy and the adverse employment action. ***Spann***, 36 S.W.3d at 465. As in a gender discrimination claim, the fourth element "requires proof that the employer treated non-pregnant employees better." ***Id.*** at 468.

In the instant case, the trial court held that the City had negated the fourth element of Ms. Pierce's gender and pregnancy discrimination claims — that she was treated less favorably than similarly situated male (and obviously nonpregnant) employees. The trial court cited two reasons for this holding. First, in its oral ruling, the trial court indicated that this element was negated because the misconduct of the allegedly similarly-situated male employees was less serious than Ms. Pierce's misconduct; therefore, Ms. Pierce had not put forth sufficient evidence that the compared male employees were similarly situated. Second, in its written order granting summary judgment, the trial court held that the City had negated the causation element of Ms. Pierce's claims by submitting undisputed evidence of a legitimate nondiscriminatory reason for terminating Ms. Pierce, namely, that she "filed a false sworn affidavit against a citizen and rendered [herself] incredible to testify as a police officer." For these reasons, the trial court held that the City had negated an element of Ms. Pierce's claims and that summary judgment in favor of the City was proper.

A plaintiff who seeks to rely on a similarly situated employee to establish her claim of discrimination is not required to show an exact correlation between the compared employee's situation and her own; she need only show that their situations "were similar in all relevant respects." ***Bobo v. UPS***, 665 F.3d 741, 751 (6th Cir. 2012). The ***Spann*** Court explained:

> The final element of a discrimination claim under the ***McDonnell Douglas*** approach requires proof that the employer treated similarly situated non-pregnant employees better. To meet this element of proof, a PDA plaintiff must make meaningful comparisons between herself and other employees who are similarly situated in all material respects. ***See Holifield v. Reno***, 115 F.3d 1555, 1562 (11th Cir. 1997). The comparable employees should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and requirements. ***See Mitchell v. Toledo Hosp.***, 964 F.2d at 583.

***Spann***, 36 S.W.3d at 468.

The male employees Ms. Pierce seeks to compare — Mr. Cook, Mr. Carrier, Mr. Allen, and Mr. Stewart — were all police officers of the same rank as Ms. Pierce, with the same supervising officers. Their alleged infractions were not identical to Ms. Pierce's infraction,

but it is not necessary to show that the compared employee's situation was identical to that of the plaintiff. In explaining his decision to terminate Ms. Pierce's employment, Chief Simmons emphasized that Ms. Pierce's act of filing a false affidavit of complaint damaged her credibility, her "effectiveness" as a police officer, and her ability to serve as "a prosecuting witness" in future cases. The trial court acknowledged that the misconduct by the compared male employees was serious, but nevertheless held that they were not similarly situated because the actions of the male employees did not "call the integrity of the police department into question the way making a false accusation against someone does, and [Ms. Pierce's] actions did."

We must respectfully disagree. The alleged misdeeds by the compared male employees included stealing and committing reckless homicide (Mr. Carrier), lying about a self-inflicted gunshot wound (Mr. Cook), committing severe child abuse (Mr. Stewart), and disabling police GPS systems so as to avoid detection (Mr. Baker). Some or all of these alleged infractions damaged the credibility of the accused male officers, impacted their effectiveness as police officers, and adversely affected their ability to serve as prosecuting witnesses. In contrast to the City's actions with respect to Ms. Pierce, the evidence in the record indicates that the City did not order internal investigations for any of the compared male employees before the criminal charges were brought against them. In addition, Mr. Carrier and Mr. Stewart, who were convicted of reckless homicide and child abuse, respectively, were permitted to resign. Therefore, we must disagree with the trial court's holding that Ms. Pierce did not put forth evidence of similarly situated employees. Furthermore, at the summary judgment stage of the proceedings, the trial court "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Gossett*, 320 S.W.3d at 784 (quoting *Blair*, 130 S.W.3d at 768 (quoting *Byrd*, 847 S.W.2d at 210-11)). Under *Hannan* and *Gossett*, in order to negate an element of a claim, the movant cannot simply show that the nonmovant has submitted *insufficient* evidence to support each element of her claim; rather, it must demonstrate affirmatively that she *cannot* establish an element of her claim. In other words, "[a] moving party cannot merely 'challenge the nonmoving party to 'put up or shut up' or . . . cast doubt on a party's ability to prove an element at trial.'" *Id.* at 789 (Clark, J., concurring) (quoting *Hannan*, 270 S.W.3d at 8). Under this standard, even if the situations of the compared male employees were not similar as a matter of law, this demonstrates only that Ms. Pierce *has not yet* submitted sufficient evidence to establish her claim; it does not negate this element or show that she *cannot* establish the fourth element of her claim. As this Court explained in *Castro v. TX Direct, LLC*:

> TX Direct [the employer] did not establish that no comparators existed that were treated more favorably. Instead, TX Direct has shown only that, based on the record before us, Ms. Castro [the plaintiff] has yet to find evidence of

-15-

a similarly situated male or non-pregnant female employee. While [the TX Direct representative's] affidavit may be evidence to support TX Direct's position that Ms. Castro was treated as favorably or more favorably than the other sales representatives, it does not affirmatively negate an essential element of her claims. As we emphasized in *White v. Target Corp*., No. W2010-02372-COA-R3-CV, 2012 WL 6599814, (Tenn. Ct. App. Dec. 18, 2012):

> "Under *Hannan*, as we perceive the ruling in that case, it is not enough to rely on the nonmoving party's lack of proof even where, as here, the trial court entered a scheduling order and ruled on the summary judgment motion after the deadline for discovery had passed. Under *Hannan*, we are required to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim."

*Id.* at \*7 n.3.

*Castro v. TX Direct, LLC,* No. W2012-01494-COA-R3-CV, 2013 WL 684785, at \*6 (Tenn. Ct. App. Feb. 25, 2013)). Therefore, even if the trial court were correct in its conclusion that the compared male employees were not situated similarly to Ms. Pierce, summary judgment on this basis does not comport with *Hannan*.

We must also disagree with the trial court's conclusion that the City "affirmatively negated the element of causation in Plaintiff's claims of gender and pregnancy discrimination" by proffering "undisputed evidence . . . that the City's legitimate reason for terminating Plaintiff's employment . . . was that the City determined that Plaintiff filed a false sworn affidavit against a citizen which resulted in the arrest of that citizen and rendered Plaintiff incredible to testify as a police officer." Respectfully, that conclusion begs the question in this case, where there is evidence of similarly-situated employees who were allegedly treated differently from Ms. Pierce and even direct evidence of discriminatory animus; the legitimacy of the City's proffered reason is the very issue disputed by Ms. Pierce. Certainly, evidence of a legitimate nondiscriminatory reason for the adverse employment action satisfies the employer's burden of production under *McDonnell Douglas*. However, the Tennessee Supreme Court has made it clear that an employer may be motivated by both a legitimate reason and a discriminatory reason, and evidence of a legitimate reason is not

sufficient under ***Hannan*** to negate the employee's claim that the employer also had a discriminatory motive.[8]  The ***Gossett*** court explained:

> Evidence satisfying an employer's burden of production pursuant to the ***McDonnell Douglas*** framework does not necessarily demonstrate that there is no genuine issue of material fact. The ***McDonnell Douglas*** framework requires only that an employer offer evidence establishing a legitimate alternative to the reason for discharge alleged by the employee. ***Burdine***, 450 U.S. at 254, 101 S. Ct. 1089.  A legitimate reason for discharge, however, is not always mutually exclusive of a discriminatory or retaliatory motive and thus does not preclude the possibility that a discriminatory or retaliatory motive played a role in the discharge decision. ***Cf. Anderson***, 857 S.W.2d at 558 (adopting the "substantial factor" test that an employee need only show a protected action "constituted an important or significant motivating factor for the discharge," not the exclusive or determinative factor, to establish a prima facie retaliatory discharge claim).  Indeed, Title VII of the Civil Rights Act recognizes that an adverse employment action may be the result of both a legitimate reason and a discriminatory motive. ***See Desert Palace, Inc. v. Costa***, 539 U.S. 90, 94-95, 123 S. Ct. 2148, 156 L.Ed.2d 84 (2003).  Furthermore, evidence showing a legitimate reason for discharge can satisfy

---

[8] We have previously noted that it is exceedingly difficult for an employer to obtain summary judgment in a discrimination case by proffering undisputed evidence of a legitimate nondiscriminatory reason for the adverse job action.  In ***Skaan v. Federal Exp. Co.,*** this Court observed:

> In ***Gossett***, in response to concerns raised in the separate opinion filed by the minority, the majority opinion stated: "[O]ur holding does not exclude the possibility of summary judgment when an employer presents undisputed evidence that a legitimate reason was the exclusive motivation for discharging the employee. In such a case, the employer has demonstrated that the employee cannot show that a discriminatory or retaliatory reason was a substantial factor in the discharge decision and therefore has met its burden of production for summary judgment. Because no genuine issue of material fact exists on an essential element, either summary judgment or directed verdict may be granted." ***Gossett***, 320 S.W.3d at 786.  Respectfully, this assertion is difficult to square with the Court's application of its standard to Mr. Gossett, inasmuch as the Court stated that the employer had to do more than present undisputed evidence of its reason for discharge, it had to also prove the negative — the absence of a retaliatory motive — by undisputed evidence. ***Id***. at 783.  The majority in ***Gossett*** did not offer an example of how an employer might meet the standard it enunciated."

***Skaan,*** 2012 WL 6212891, at *5 n.5.

the requirements of the ***McDonnell Douglas*** framework without tending to disprove any factual allegation by the employee.  An employer therefore may meet its burden of production pursuant to ***McDonnell Douglas*** without satisfying the burden of production set forth in Tennessee Rule of Civil Procedure 56.04 for a party moving for summary judgment.  ***See, e.g., Mills***, 300 S.W.3d at 631; ***Martin***, 271 S.W.3d at 83; ***Hannan***, 270 S.W.3d at 5; ***Staples v. CBL & Assocs., Inc.***, 15 S.W.3d 83, 88 (Tenn. 2000); ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998); ***Byrd v. Hall***, 847 S.W.2d 208, 214 (Tenn. 1993).

***Gossett***, 320 S.W.3d at 782; ***see also Wright v. Murray Guard, Inc.***, 455 F.3d 702, 721 (6th Cir. 2006) (Moore, J., concurring) (stating that "[i]nquiries regarding what actually motivated an employer's decision are very fact intensive and thus will generally be difficult to determine at the summary-judgment stage").  The ***Gossett*** Court later reiterated:

> As the United States Supreme Court explained in ***Aikens***, evidence of a legitimate reason for the discharge, combined with the employee's evidence of a prima facie case, generally presents a question of fact for the factfinder. 460 U.S. at 715, 103 S.Ct. 1478 (quoting ***Burdine***, 450 U.S. at 253, 101 S.Ct. 1089).  Therefore, an employer that has satisfied its burden of production for the ***McDonnell Douglas*** framework likely has not satisfied its burden of production for summary judgment.

***Gossett***, 320 S.W.3d at 786.  Therefore, summary judgment in favor of the City was inappropriate on this basis as well.

Finally, we are compelled to note that neither the trial court's oral ruling nor its order granting summary judgment mentioned the alleged discriminatory comments by Chief Simmons or the temporal proximity between Chief Simmons learning that Ms. Pierce was pregnant and the termination of her employment.  "[S]uspicious timing" can be "indirect" evidence of discriminatory intent, and remarks indicating animus can constitute either direct or indirect evidence of such intent, depending on the remarks and their context.  ***See Spann***, 36 S.W.3d at 464.  Such evidence is further reason to conclude that it was improper to grant summary judgment in favor of the City in this case.

Accordingly, for all of the reasons discussed above, we must conclude that the trial court erred in granting summary judgment in favor of the City on Ms. Pierce's claims of discrimination on the basis of gender and pregnancy.  This holding pretermits all other issues raised on appeal.  We reverse the trial court's grant of summary judgment and remand for further proceedings consistent with this opinion.

## CONCLUSION

The decision of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to Appellee the City of Humboldt, Tennessee, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE